569 F.2d 10
 186 U.S.App.D.C. 179
 John BRIGGS et al.
v.
Guy GOODWIN, Individually and as Attorney for the U. S.
Department of Justice, Appellant,
William H. Stafford, Individually and as U. S. Attorney for
the Northern District of Florida, et al.
 No. 75-1642.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 13, 1976.
Decided Sept. 21, 1977.
Rehearing Denied Dec. 1, 1977.
 
 R. John Seibert, Atty., Dept. of Justice, Washington, D. C., with whom Robert L. Keuch and Benjamin C. Flannagan, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellant. George W. Calhoun, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellant.
 Nancy Stearns, New York City, with whom Doris Peterson, Morton Stavis and Philip J. Hirschkop, New York City, were on the brief, for appellees.
 Before McGOWAN, ROBINSON and WILKEY, Circuit Judges.
 Opinion for the court filed by McGOWAN, Circuit Judge.
 Dissenting opinion filed by WILKEY, Circuit Judge.
 McGOWAN, Circuit Judge:
 
 
 1
 This case raises a difficult question concerning the precise scope of the absolute prosecutorial immunity afforded by the Supreme Court in Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Plaintiffs-appellees brought in the District Court a civil action in tort grounded upon the Constitution, alleging injury by reason of defendant-appellant's assertedly false testimony in a hearing held in connection with a grand jury investigation of appellees' activities as members of an antiwar organization. Appellant moved to dismiss on the ground that he enjoyed absolute immunity from any damage action based upon his conduct while acting in his official capacity as a special federal prosecutor. The District Court denied this motion, and we affirm.
 
 
 2
 * Both the facts alleged in appellees' complaint and the procedural posture of this appeal are important to our decision of it. We take appellees' allegations to be true, as we are bound to do upon review of the District Court's pretrial disposition of a motion to dismiss.
 
 
 3
 On July 7, 1972, appellant Goodwin, an attorney with the Internal Security Division of the United States Department of Justice, was appointed to serve as a Special Attorney for the investigation and prosecution of certain federal crimes which had allegedly occurred in the Northern District of Florida. Goodwin's letter of appointment was vague in its delineation of Goodwin's duties thereunder. It stated that the Department of Justice was "informed that various persons (had) violated . . . the (federal) anti-riot laws, Title XI of the Organized Crime Control Act of 1970 (dealing with the manufacture, sale, and transportation of explosives), (and the) conspiracy . . . and other Federal criminal statutes." Goodwin was instructed "to assist in the trial of the case or cases growing out of the transactions . . . mentioned in which the Government is interested."
 
 
 4
 On the day of Goodwin's appointment, subpoenas were served upon more than twenty members of a group known as the Vietnam Veterans Against the War/Winter Soldier Organization (VVAW/WSO). Some of the persons subpoenaed were in Miami, preparing for an antiwar march scheduled to coincide with the 1972 Democratic National Convention, which met from July 10 to July 13, 1972. Others were located in Texas, Arkansas, Louisiana, and Washington, D. C. All individuals subpoenaed were ordered to appear before a federal grand jury in Tallahassee, Florida, three days after service of the subpoenas, on the morning of July 10, 1972. Among those persons so subpoenaed were nine of the ten appellees in this case. (Appellee Briggs was not subpoenaed until a month later.)
 
 
 5
 Considerable confusion attended the commencement of the grand jury proceeding. Though all were members of the same organization, many of those subpoenaed had not known each other previously. Attorneys hastily retained to represent appellees had little time to consult with their clients before the grand jury began its inquiries. Recurring rumors of police and FBI infiltration of the VVAW/WSO prompted concern that one or more informants might be present among those who sought legal advice prior to their grand jury appearances. This prompted counsel to file a motion with the District Court in Tallahassee to direct Goodwin and his associates to disclose any agents or informers among those subpoenaed. The District Court's initial response was to ask counsel for a list of the witnesses in question and their counsel. This was done in the afternoon of July 12 by an oral submission on the record in open court of a list of potential grand jury witnesses (including one Emerson Poe) and their respective attorneys. The following morning the motion was taken up in open court. As movants' counsel was stating his belief that Goodwin should file an affidavit supplying the information requested by the motion, he was interrupted by the court's peremptory direction to Goodwin to take the witness stand and be sworn. The transcript shows that the court then asked Goodwin one question:
 
 
 6
 THE COURT: Mr. Goodwin, are any of witnesses represented by counsel agents or informants of the United States of America?
 
 
 7
 THE WITNESS: No, Your Honor.
 
 
 8
 THE COURT: You can step down.
 
 
 9
 (Witness excused.)
 
 
 10
 To counsel's immediately succeeding question, "Your Honor, may we be permitted to question Mr. Goodwin on this?," the court denied such permission.
 
 
 11
 None of the subpoenaed VVAW members actually testified during the four-day grand jury proceeding. Indeed, two appellees (Beverly and Jennings), along with two other VVAW members not parties to this litigation, were imprisoned for contempt, when they persisted in their refusal to testify after grants of use immunity.[1] An indictment was returned on the evening of July 13, 1972 charging six appellees (not including Beverly and Jennings) with a variety of crimes centering around an alleged conspiracy to unlawfully disrupt the 1972 Republican National Convention.[2]
 
 
 12
 The Government's investigation of VVAW activity continued, and on August 7, 1972, appellee Briggs was subpoenaed to appear before the Tallahassee grand jury. Slightly more than two months later, on October 18, 1972, a superseding indictment was filed, adding appellee Briggs as a co-conspirator, and appellee Michelson as an aider and abettor of the conspiracy. Trial of the eight appellees covered by this new indictment commenced on July 31, 1973. On August 17, 1973, appellees received, pursuant to the Jencks Act, 18 U.S.C. § 3500 (1970), a series of written materials which revealed that Emerson Poe had been functioning as a paid FBI informant since January, 1972; and Poe testified, over objection, as a prosecution witness at appellees' criminal trial. Appellees allege that, prior to the July, 1972 grand jury proceeding, Poe had on several occasions relayed to federal investigators the substance of his conversations with appellee Camil, and that Poe's reporting did not cease with the return of indictments in 1972; rather, it served as an ongoing source of information concerning appellees' criminal defense strategy. Despite this disadvantage, appellees were acquitted of all criminal charges on August 31, 1973.
 
 
 13
 The complaint in the civil action was filed in the District Court for the District of Columbia on May 28, 1974. It alleged, inter alia, injury arising from appellant's representation to the Florida court that no informants were among those individuals ordered to appear before the grand jury.[3] Relying upon Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), appellees sought declaratory relief, damages, and the appointment of a special prosecutor to explore the alleged official wrongdoing. On July 22, 1974, appellant moved to dismiss on the ground that, as stated in his brief, "as a Special Attorney of the United States Department of Justice, he (is), pursuant to the doctrine of quasi-judicial immunity, absolutely immune from any damage action based upon alleged misconduct while acting in such a capacity." This motion was denied on November 20, 1974. 384 F.Supp. 1228.
 
 
 14
 On December 13, 1974, appellant filed a fresh motion to dismiss, urging that "as a witness in a Federal court he is absolutely immune from any damage action or civil suit based upon his alleged false testimony in such judicial proceeding." Alternatively, appellant asked the District Court to certify "the issue of immunity" for interlocutory appeal in accordance with the provisions of 28 U.S.C. § 1292(b) (1970). In an order dated March 4, 1975, the District Court denied appellant's motion to dismiss on the ground of witness immunity, and also expressly refused (what it interpreted as) appellant's request to certify the issue of witness immunity for interlocutory appeal under § 1292(b). However, the District Court did agree to certify the issue of quasi-judicial (or prosecutorial) immunity for such appeal, and included in its March 4 order a declaration that the "Order of November 20, 1974 . . . be and hereby is certified for interlocutory appeal . . . pursuant to 28 U.S.C. § 1292(b)." On May 27, 1975, a motions panel of this court granted appellant leave to appeal pursuant to § 1292(b). The resultant interlocutory challenge to the District Court's failure to dismiss the complaint is the matter now confronting us.[4]
 
 II
 
 15
 In Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872), the Supreme Court declared that
 
 
 16
 it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own conviction, without apprehension of personal consequences to himself.
 
 
 17
 At 347 (emphasis added). Subsequent decisions have consistently adhered, either explicitly or implicitly, to the proposition that official immunity, whether absolute or qualified, extends only so far as the affected government official's authority. See, e. g., Scheuer v. Rhodes, 416 U.S. 232, 250, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Apton v. Wilson, 165 U.S.App.D.C. 22, 29-35, 506 F.2d 83, 90-95 (1974). A government employee is not to be protected merely by virtue of his official position for conduct undertaken outside the scope of his authority. Apparently relying upon these well-settled rules, the District Court in this case reasoned that: (1) Goodwin allegedly perjured himself; (2) perjury is never within a prosecutor's authority; (3) Goodwin cannot be immune for activity wholly outside his authority.[5]
 
 
 18
 The difficulty with this approach is that any allegation that an official, acting under color of law, has deprived someone of his rights necessarily implies that, in the particular case, the official exceeded his authority. Such logic would completely abrogate the doctrine of immunity.[6] Rather, in heeding a district judge's directive to answer a question relating to his official duties, appellant performed the kind of act not "manifestly or palpably beyond his authority," but rather "having more or less connection with the general matters committed by law to his control or supervision." Spalding v. Vilas, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896); see, e. g., Bivens v. Six Unknown Named Agents, 456 F.2d 1339, 1343-45 (2d Cir. 1972) (on remand); Cooper v. O'Connor, 69 App.D.C. 100, 104, 99 F.2d 135, 139, cert. denied, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414 (1938); note 6 supra. The question, then, is whether the immunity to be accorded appellant is qualified or absolute.[7]
 
 III
 
 19
 Finding that appellant's alleged behavior in this case falls outside the confines of those prosecutorial activities for which Imbler prescribed an absolute prosecutorial immunity, we hold that appellant here is entitled only to a qualified immunity, that is to say, his protection from liability depends upon a showing that he entertained a good-faith, reasonable belief in the truth of his response to the federal district judge in Florida. In reaching this result, we rely on a series of federal decisions distinguishing between a prosecutor's role as advocate, on the one hand, and his function as an administrative or investigative officer, on the other. We further rely upon the Supreme Court's recognition of this distinction in Imbler, and its express disclaimer of any intention to extend the sway of that case beyond those prosecutorial activities "intimately associated with the judicial phase of the criminal process." 424 U.S. at 430, 96 S.Ct. at 995.
 
 
 20
 The alleged prosecutorial misconduct before the Supreme Court in Imbler was quite different from that attributed to appellant in this case, and much more typical of the abuses which have commonly inspired civil actions against prosecutors. Petitioner in Imbler was convicted of first-degree felony murder, and his conviction was unanimously affirmed by the California Supreme Court. Thereafter the local district attorney who had prosecuted Imbler voluntarily wrote to the Governor, announcing the discovery of new evidence, some of which tended to corroborate Imbler's alibi defense, and some of which tended to cast doubt upon the credibility of the state's chief identification witness. Though all the new evidence taken together did not conclusively establish Imbler's innocence, the district attorney believed that considerations of fairness compelled disclosure. On the basis of the new information thus revealed, Imbler filed a state habeas corpus petition. While Imbler's brief in support of this petition praised the prosecutor's post-trial devotion to duty, it also charged him with knowing use of false testimony and suppression of material evidence. The habeas petition was unanimously rejected by the California Supreme Court.
 
 
 21
 Nearly five years later, Imbler raised essentially the same contentions in a federal habeas petition. Rendering its decision upon the record without a hearing, the federal district court found several instances of prosecutorial misconduct at trial and accordingly granted habeas relief. The Ninth Circuit affirmed, and when California chose not to retry Imbler, he was released. Subsequently, over eleven years after commission of the offense for which he had been imprisoned, Imbler filed a civil rights suit under 42 U.S.C. § 1983,[8] claiming, inter alia, that the local prosecutor had intentionally allowed the state's leading identification witness to testify falsely, had permitted the suppression of fingerprint evidence favorable to Imbler, and had used at trial a police artist's sketch allegedly altered to resemble Imbler more closely. The complaint also maintained that the district attorney's decision to proceed with the prosecution was improper in light of an earlier lie detector test which had allegedly cleared Imbler. The federal District Court granted a motion to dismiss on the ground of prosecutorial immunity, and the Ninth Circuit affirmed by a divided panel.500 F.2d 1301 (1974). The Supreme Court granted certiorari and affirmed.424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).
 
 
 22
 Justice Powell's opinion for the Court recognized that the doctrine of prosecutorial immunity finds both its common law origins and its primary application in the malicious prosecution context. "The function of a prosecutor that most often invites a common law tort action is his decision to initiate a prosecution, as this may lead to a suit for malicious prosecution if the State's case misfires." Id. at 421, 96 S.Ct. at 990. Still focusing on common law precedents, the Court outlined the shared rationale supporting judicial, prosecutorial, and grand juror immunity:
 
 
 23
 The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties. These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust.
 
 
 24
 Id. at 422-23, 96 S.Ct. at 991 (footnote omitted). With respect to these potential dangers, the Court could discern no distinction between § 1983 actions and common law malicious prosecution suits. "If a prosecutor had only a qualified immunity, the threat of § 1983 suits would undermine performance of his duties no less than would the threat of common law suits for malicious prosecution." Id. at 424, 96 S.Ct. at 992.
 
 
 25
 Throughout the Court's opinion, the concentration on claims likely to arise from prosecutorial behavior at or immediately before trial is manifest. "A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court." Id. (emphasis added). Describing the perils of a contrary result in Imbler, the Court observed that
 
 
 26
 suits that survived the pleadings would pose substantial danger of liability even to the honest prosecutor. The prosecutor's possible knowledge of a witness' falsehoods, the materiality of evidence not revealed to the defense, the propriety of a closing argument, and ultimately in every case the likelihood that prosecutorial misconduct so infected a trial as to deny due process, are typical of issues with which judges struggle in actions for post-trial relief, sometimes to differing conclusions. The presentation of such issues in a § 1983 action often would require a virtual retrial of the criminal offense in a new forum, and the resolution of some technical issues by the lay jury. It is fair to say, we think, that the honest prosecutor would face greater difficulty in meeting the standards of qualified immunity than other executive or administrative officials.
 
 
 27
 Id. at 425, 96 S.Ct. at 992 (footnote omitted). All of the worrisome issues thus enumerated by the Court involve possible prosecutorial errors of commission or omission in connection with the trial of a criminal case. This point was further emphasized a bit later in the Imbler opinion when the Court defended its decision in terms of the effective functioning of the criminal justice system: "Attaining the system's goal of accurately determining guilt or innocence requires that both the prosecution and the defense have wide discretion in the conduct of the trial and the presentation of evidence." Id. at 426, 96 S.Ct. at 993 (footnote omitted; emphasis added). In conclusion, the Court explicitly "delineate(d) the boundaries" of its holding.
 
 
 28
 The purpose of the Court of Appeals' focus upon the functional nature of the activities rather than respondent's status (as a prosecutor) was to distinguish and leave standing those cases, in its Circuit and in some others, which hold that a prosecutor engaged in certain investigative activities enjoys not the absolute immunity associated with the judicial process, but only a good-faith defense comparable to the policeman's. We agree with the Court of Appeals that respondent's activities were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force. We have no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate. We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983.
 
 
 29
 Id. at 430-31, 96 S.Ct. at 995 (emphasis added) (citation and footnotes omitted).
 
 
 30
 Lest his stress on the advocacy function suggest that the Court was contemplating a mechanical immunity test based solely upon whether alleged prosecutorial misconduct occurred in court during the course of a trial, Justice Powell added a few words of elaboration in the margin.
 
 
 31
 We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom. A prosecuting attorney is required, constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them.
 
 
 32
 Id. at 431 n. 33, 96 S.Ct. at 995. Thus, the Court, while acknowledging the potential factual problems of future cases, reaffirmed its fundamental reliance on the advocate's role as the source of the absolute prosecutorial immunity applied in Imbler. Although the passage quoted above makes clear that a prosecutor's advocacy function does extend beyond the confines of the trial courtroom, the examples of such preliminary advocate activities provided by the Supreme Court are instructive for their common focus on a particular criminal proceeding. By the plain import of the Court's remarks, absolute immunity under Imbler extends only so far as necessary to protect a prosecutor's decision with respect to the initiation and conduct of particular cases. Imbler does not, in our reading, immunize prosecutors for any and all measures they may undertake in the course of wide-ranging law enforcement investigations or general fact-finding expeditions.
 
 
 33
 As the Supreme Court observed, the Ninth Circuit's affirmance in Imbler deliberately left undisturbed earlier decisions in that court and others which had held that prosecutors are entitled to only a qualified immunity for conduct performed in an investigative or administrative capacity. See Apton v. Wilson, 165 U.S.App.D.C. 22, 30, 32-33, 506 F.2d 83, 91, 93-94 (1974); Guerro v. Mulhearn, 498 F.2d 1249, 1256 (1st Cir. 1974); Hampton v. City of Chicago, 484 F.2d 602, 608-09 (7th Cir. 1973) (Stevens, J.), cert. denied, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974); Littleton v. Berbling, 468 F.2d 389, 410-11 (7th Cir. 1972), cert. denied, 414 U.S. 1143, 94 S.Ct. 894, 39 L.Ed.2d 97 (1974); Dodd v. Spokane County, Washington, 393 F.2d 330, 335 (9th Cir. 1968); Robichaud v. Ronan, 351 F.2d 533, 536-37 (9th Cir. 1965); Tomko v. Lees, 416 F.Supp. 1137, 1139 (W.D.Pa.1976), and Burkhart v. Saxbe, 397 F.Supp. 499, 503 n.4 (E.D.Pa.1975). Cf. Madison v. Purdy, 410 F.2d 99, 101-02 (5th Cir. 1969); Lewis v. Brautigam, 227 F.2d 124, 128-29 (5th Cir. 1955), and Ames v. Vavreck, 356 F.Supp. 931, 936-37 (D.Minn.1973) (all refusing to apply absolute immunity to arguably "investigative" activities, although doing so on the ground that the prosecutor's alleged behavior may have been "outside the scope of his jurisdiction;" only Ames refers specifically to prosecutors acting as investigators). See also Brawer v. Horowitz, 535 F.2d 830, 834 (3d Cir. 1976) (noting the Imbler distinction between advocacy and investigation); Tyler v. Witkowski, 511 F.2d 449, 451 (7th Cir. 1975) (applying absolute immunity in a § 1983 false imprisonment suit, but citing Hampton, and explicitly acknowledging that the conduct assailed was not investigatory); Duba v. McIntyre, 501 F.2d 590, 592 (8th Cir. 1974), cert. denied, 424 U.S. 975, 96 S.Ct. 1480, 47 L.Ed.2d 745 (1976) (apparently accepting the proposition that absolute immunity will not apply to prosecutors acting in an investigatory capacity); Barnes v. Dorsey, 480 F.2d 1057, 1060 (8th Cir. 1973) (specifically reserving "the question of the liability of a prosecutor acting within an investigatory capacity"); Wilhelm v. Turner, 431 F.2d 177, 182-183 (8th Cir. 1970), cert. denied, 401 U.S. 947, 91 S.Ct. 919, 28 L.Ed.2d 230 (1971) (recognizing that earlier cases had drawn the advocacy-investigation distinction, but finding it unnecessary to rule on the matter, since, in any event, affidavits established that the State Attorney General and his assistant were "acting in good faith and had probable cause for their actions"); Fanale v. Sheehy, 385 F.2d 866, 869 (2d Cir. 1967) (Feinberg, J. and Waterman, J., though concurring in a holding of immunity, agree that "there would be some situations . . . in which even 'official' acts of a prosecuting officer should not be protected by absolute immunity from civil liability"); Bauers v. Heisel, 361 F.2d 581, 589-95 (3d Cir. 1966) (en banc ), cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967) (finding absolute immunity in an easy case where plaintiff attacked the prosecutor's choice of forum, but nevertheless provoking one concurrence which refused to reach the immunity issue, and a second concurrence and two dissents which took issue with the majority's sweeping description of a prosecutor's quasi-judicial immunity); and Harmon v. Superior Court, 329 F.2d 154, 155 (9th Cir. 1964) (commenting that the acts complained of were "quasi-judicial" acts, and therefore entitled to quasi-judicial immunity). But cf. Cambist Films, Inc. v. Duggan, 475 F.2d 887, 888-89 (3d Cir. 1973) (ambiguous per curiam in common law damage action arising out of illegal seizure allegedly ordered by local district attorney; seems to suggest that, even had the action been brought under § 1983, absolute immunity would apply to all prosecutorial behavior, regardless of character, unless defendant acted "in the clear absence of all jurisdiction").[9]
 
 
 34
 We find ourselves in general agreement with the common theory underlying the first group of decisions listed above. When a prosecutor is engaged in essentially investigative as opposed to advocatory activities, the considerations of public policy which necessitated a grant of absolute immunity in Imbler no longer control. Regardless of his official status, a prosecutor functioning primarily as an investigator should be accorded only the qualified immunity typically conferred on other investigative officers. The crucial inquiry concerns the nature of the official behavior challenged, not the identity or title of the officer responsible therefor. These sentiments were well-expressed by the Fourth Circuit in McCray v. Maryland, 456 F.2d 1 (4th Cir. 1972):
 
 
 35
 The immunity of "quasi-judicial" officers such as prosecuting attorneys and parole board members derives, not from their formal association with the judicial process, but from the fact that they exercise a discretion similar to that exercised by judges. Like judges, they require the insulation of absolute immunity to assure the courageous exercise of their discretionary duties. Where an official is not called upon to exercise judicial or quasi-judicial discretion, courts have properly refused to extend to him the protection of absolute judicial immunity, regardless of any apparent relationship of his role to the judicial system.
 
 
 36
 456 F.2d at 3-4 (footnotes omitted).
 
 
 37
 Accepting as true the allegations of the complaint herein, as we must in the present posture of this case, we believe that appellant's false statement to the federal district court in Florida is properly characterized as an act of investigation rather than advocacy. To some extent, of course, assignment of a particular incident to one of several mutually exclusive abstract categories is likely to involve an element of arbitrariness, especially where the incident in question was clearly not envisioned by those who originally devised the classificatory scheme. But appellant's alleged perjury bears no relation whatever to the advocate's role as conceived by the Supreme Court in Imbler. The obligation to disclose, pursuant to judicial direction, the presence of Government informants among those subpoenaed to testify before the grand jury is entirely foreign to advocacy issues such as whether to initiate a prosecution or how to conduct a prosecution once begun. Such disclosure was, rather, an action required of appellant by the court in order to enable the court to deal with a possible defect in the conditions under which subpoena compulsions had been brought to bear in the grand jury investigation.
 
 
 38
 Application of only a qualified immunity in this case cannot possibly arouse the fears which animated the Supreme Court in Imbler, namely, that prosecutors will be adversely affected in the discharge of their public duties. The federal district court in Florida sought information about one aspect of the Government's investigation of the VVAW. Appellant allegedly provided the court with willfully false information about the matter, with the result that a Government informant remained in appellees' confidence for approximately a year longer than he otherwise would have. We can detect nothing even vaguely resembling advocacy in appellant's behavior. Indeed, even the language of appellant's own motion to dismiss in the District Court acknowledges that he was dispatched to Florida for the purpose of conducting an investigation. Though he asserts in conclusory fashion that his challenged action "fall(s) squarely within the exercise of the judicial function" (see Brief for Appellant at 23, 35 n.15), appellant cites absolutely no authority for the proposition that the statement of which appellees complain was in the nature of advocacy.
 
 
 39
 Appellant has referred us to over twenty cases which purportedly establish that "prosecutors enjoy absolute immunity for acts done in the performance of their official functions." Brief for Appellant at 18 & n. 9. We have examined all these decisions and numerous others of a similar nature, but find none of them determinative of the dispute now before us. The cases collected by appellant hold unanimously that a prosecutor is entitled to absolute immunity for his quasi-judicial activities. After Imbler, this point is incontestable. However, none of the precedents upon which appellant relies support his contention that the behavior at issue here falls within the scope of the absolute quasi-judicial immunity endorsed by the Supreme Court in Imbler. The vast majority of cases cited involve claims arising from prosecutorial acts which unquestionably qualify for immunity under Imbler, e. g., the decision to initiate a criminal prosecution or the orchestration of an ensuing criminal trial.[10] The combined efforts of counsel and this court have failed to unearth a single prior occasion on which damages have been sought for misconduct like that alleged here.
 
 
 40
 We are aware that earlier cases in which prosecutorial behavior has been termed investigative have involved factual situations distinct from that currently before us.[11] Nevertheless, the dissimilarities between this case and those which have preceded it do not render the conduct at issue here any less investigative or any more advocatory. Appellant contends rather mechanically that because his alleged perjury occurred in a courtroom exchange, after a grand jury had been convened, the description "intimately associated with the judicial process" automatically fits. Our answer to this argument is two-fold.
 
 
 41
 First, the timing of prosecutorial action, by itself, is not dispositive of the immunity issue. The fact that a grand jury is about to hear testimony or has already begun to hear testimony does not imply that all subsequent prosecutorial activity is ipso facto advocacy, and not investigation. Justice Powell's penultimate footnote in Imbler established that the advocate's role could entail certain "actions preliminary to the initiation of a prosecution and actions apart from the courtroom." 424 U.S. at 431 n. 33, 96 S.Ct. at 995. This does not foreclose the fact that the investigative function may embrace some acts even when performed after the commencement of judicial proceedings. Attention must be focused on the behavior itself, and not solely on its timing. Appellant's statement to the court in Florida does not acquire the character of advocacy merely because it was made after the grand jury had met, rather than several days earlier.
 
 
 42
 Secondly, and completely independent of the timing point, we think that, in a real sense, this litigation concerns behavior more plainly investigative than that encountered in some of the earlier cases cited above. In Robichaud, for example, the crucial events took place only after the prosecutors' field of vision had already narrowed to one crime and one prospective defendant. A criminal complaint was filed, allegedly with malice and without probable cause, charging the sixteen-year old appellant with first degree murder. In due course, she was arrested, and, allegedly under the direction of the County Attorney and his deputy, police officials attempted to extract a confession from her through lengthy confinement in the "drunk tank" with adult female prisoners, a forced visit to the scene of the crime, and various species of deceit and intimidation. These latter features of appellant's § 1983 complaint prompted the Ninth Circuit's reference to investigative conduct by prosecutors.
 
 
 43
 Here, by contrast, appellant's primary task in Florida was to determine whether any violations of federal law properly attributable to the VVAW or its members had occurred. If any such federal crimes had been committed, Goodwin was to ascertain the precise nature of those crimes, and the identity of VVAW members to whom criminal liability might attach. The grand jury was to function in the first instance as an investigative tool, rather than in its more familiar guise as a deliberative body deciding whether to return indictments for specific crimes on the basis of evidence gathered and presented by a public prosecutor. The grand jury proceeding in this case was designed as a broad scale investigation into possible illegal activity by the VVAW or its members. The Fifth Circuit in Beverly characterized it as such by saying (at p. 735 of 468 F.2d) that "(t)he grand jury was investigating alleged plans of the VVAW to disrupt the Republican National Convention in Miami, Florida, to be held the week of August 21, in violation of various criminal statutes."
 
 
 44
 Several pieces of evidence may be adduced in support of this proposition. First, many more VVAW members were subpoenaed to appear before the grand jury than were ever indicted. Second, the indictments which the Government did obtain were returned despite the fact that none of the VVAW members subpoenaed actually testified. Third, appellee Briggs was subpoenaed a month after the original group of subpoenas was issued, and appellees Briggs and Michelson were indicted more than three months after appellant's investigation began. The ongoing character of the grand jury process in this case helps to convince us that appellant had embarked on what was fundamentally a fact-finding mission, and that his false statement to the court, if such it was, was intended to approve the prospects for that endeavor's success.
 
 
 45
 We mention one further reason for our conclusion that the absolute immunity contemplated by Imbler does not cover this case. As Judge Leventhal observed for this court in Apton, supra, absolute prosecutorial immunity for behavior "intimately associated with the judicial process" is "both justified and bounded by the judicial traditions and procedures that limit and contain the danger of abuse." 165 U.S.App.D.C. at 32, 506 F.2d at 93. When prosecutorial activity is properly classifiable under the "quasi-judicial" rubric, "the circumstances typically provide alternative instruments of the judicial branch to check misconduct the discretion of the grand jury, the procedures of a trial, and the potential sanction of discipline imposed by the court itself." Id. 165 U.S.App.D.C. at 33, 506 F.2d at 94. In theory, of course, appellant faces both criminal and professional penalties for any misrepresentations he may have made to the federal district court in Florida. However, the passage of four and a half years without any apparent official inquiry, even by the court to which the seeming misstatement was made, into appellants' conduct in July, 1972 underscores the fact that such restraints on prosecutorial excesses are likely to remain theoretical only. The demonstrably negligible probability of official discipline thus detracts from the significance of the third safeguard enumerated in Apton.
 
 
 46
 Even were this not so, the first two potential checks suggested in Apton were totally absent here. As indicated above (see the discussion of Imbler following note 8 supra ), typical civil suits against prosecuting attorneys involve allegations of malicious prosecution, deliberate use of false testimony, or deliberate suppression of exculpatory evidence. In all these situations, jury discretion is brought to bear in evaluating the persuasiveness of the prosecution's presentation, and defense counsel enjoys the opportunity to employ a variety of procedural devices to challenge the accuracy of the Government's position and thereby to preserve the integrity of the truth-seeking enterprise. Here, no jury assessed the credibility of appellant's assertion that no Government informants were included among the subpoenaed VVAW members. In addition, appellees and their counsel were required to accept appellant's representation on faith. The court, which put the one and only question asked, did not explore the basis for appellant's denial that informants were present in appellees' camp, and appellees' effort to pursue the matter further through questioning was not permitted. Given, therefore, not only the character of appellant's statement as protective of the investigation so he proposed to conduct it, but also its peculiar insulation from probing examination and jury appraisal, we regard absolute immunity as inappropriate in this case. It may of course be true that appellant's answer to the court's question was made in perfect good faith, but that is a matter open to demonstration under qualified immunity.
 
 IV
 
 47
 The dissent, stressing that the gravamen of appellees' complaint concerns an act committed on the witness stand, seeks to resolve the dispute before us by reference to the common law doctrine of witness immunity. The dissent asserts that "(i)t thus becomes necessary in these opinions to treat both prosecutorial and witness immunity." Whatever else may be said of this approach, it inevitably involves consideration of subjects neither briefed nor argued on this appeal. Presumably, appellant's failure to raise the witness immunity point on appeal is attributable to the District Court's refusal to certify that matter for immediate interlocutory appeal under 28 U.S.C. § 1292(b) (1970).[12] We address it only because the dissent treats it as dispositive.
 
 
 48
 Appellant's initial motion to dismiss, filed July 22, 1974, alleged lack of subject matter jurisdiction and absolute immunity from any suit based upon appellant's conduct "while acting in his official capacity . . . as a Special Attorney of the United States Department of Justice and Federal prosecutor" responsible for the VVAW investigation and grand jury proceeding. That motion was denied by the District Court's order of November 20, 1974. Nearly a month later, appellant filed a new motion to dismiss grounded on witness immunity. In an order issued March 4, 1975, the District Court (1) denied the second motion to dismiss, (2) certified the November 20 order for interlocutory appeal under § 1292(b), and (3) expressly refused to certify for that purpose the March 4 order involving witness immunity.
 
 
 49
 In enacting § 1292(b), Congress vested in the district judge power to determine which orders involve controlling questions of law appropriate for interlocutory review. In light of this statutory scheme, it is not surprising that government counsel representing appellant apparently believed that the witness immunity issue was not before this court, but rather was preserved for ultimate review of a final judgment in this law suit. Since § 1292(b) provides in terms for appeals from orders, as distinct from the controlling questions of law identified by the district judge, it has been suggested that, when a particular order is the subject of an interlocutory appeal under § 1292(b), all other issues relevant to the result reached by that order should be open for appellate consideration.[13] This position is not yet firmly established in reported decisions. Moreover, even if we were to accept it without reservation, its force would be substantially diminished in the present context where the order certified for appeal is a separate order from the one denying the witness immunity motion.
 
 
 50
 We do not pursue the matter for the reason that a majority of the panel are of the view that, given the desirability of avoiding further proceedings in the trial court if appellant is in fact shielded by an absolute immunity of any kind, we may, and should, address the witness immunity point pursuant to what the Supreme Court has recently termed "the so-called 'collateral order' exception to the final judgment rule first announced in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) . . .," Abney v. United States, 431 U.S. 651, 657, 97 S.Ct. 2034, 2039, 52 L.Ed.2d 651 (1977) (pre-trial order denying motion to dismiss indictment on double jeopardy grounds appealable immediately). Since appellant's claim of absolute witness immunity can be said to be collateral to, and separate from, the issue of his liability to be explored at trial, and since absolute immunity is designed to protect against amenability to suit itself as well as to a verdict of liability at trial, the theoretical foundations of the collateral order doctrine, at least as they are characterized in Abney, may be thought to be present here.[14]
 
 
 51
 We turn to the merits without the customary benefit of briefing and argument by the parties, but we doubt that appellant would seriously undertake to maintain that he was an ordinary witness. Although he was called upon by the court to make a representation of fact in a courtroom after being sworn, that act did not involve giving testimonial evidence in the usual sense at a trial or even before grand jurors. He was directed to do so by the court in order promptly to get a representation from counsel on the record under oath, and thereby to lay to rest the legitimate claim of appellees that they were entitled to know, before submitting to the compulsion of the subpoenas, whether their number included Government undercover agents.
 
 
 52
 That claim raised a question going to the very integrity of the manner in which the grand jury proceeding was being conducted. Had appellant volunteered to represent as an officer of the court that no informers were involved, and had the parties been content with that, there would be no issue as to witness immunity worthy of the name. The difference between the falsity of such a nontestimonial representation, on the one hand, and the technical consequence of perjury attached to a statement under oath, on the other, is not at the heart of the immunity issue in this appeal. The question is whether appellant is wholly immune from a civil suit based upon his utterance of an allegedly false statement in the context of countering a challenge to the manner in which he was conducting a grand jury inquiry.
 
 
 53
 The statement assailed here was prompted by, and directly incidental to, appellant's status as a prosecutor managing and administering an investigation. Appellant's unqualified negative response to the district judge's plain and abrupt question was essential to the forward progress of the grand jury investigation, for which appellant as a federal prosecutor had been charged by his superiors with the responsibility. To the extent that appellant's one word answer is viewed as a testimonial act, it was one occasioned by, and critical to, appellant's discharge of that responsibility.
 
 
 54
 The dissent thus is unrealistic in treating appellant not as a prosecutor managing and directing an investigation but rather as an ordinary witness summoned to give his evidence in a legal proceeding. It is obvious from the transcript that the court did not consider appellant to be an ordinary witness. It ordered him to take the stand; it asked him one question; and it forthwith excused him. Indeed, when appellees' counsel sought leave to cross-examine, the court denied it. The policies underlying the common law doctrine of witness immunity are tangential, and essentially irrelevant, to the question of whether appellant a prosecutor functioning in an investigative context should be accorded complete invulnerability to suit for the consequences of an act performed in that capacity.
 
 
 55
 Our holding on this aspect of the appeal rests on the foregoing considerations, and it is, accordingly, of a piece with what we have said earlier in this opinion with respect to the prosecutorial immunity issue certified by the District Court. If we have misconceived the precise scope of Imbler, then our finding of qualified, as distinct from absolute, immunity on the facts of this case will fall. But that result, in our submission, will not be because appellant's answer to the question put to him by the court was given from the witness stand. It will be because that act will be deemed, even under the special circumstances of this case, not to come within the prosecutorial administrative and investigative functions reserved by Imbler.
 
 
 56
 Having thus made clear that in our view this record in truth raised no issue of witness immunity to be certified by the District Court as "a controlling question of law as to which there is substantial ground for difference of opinion," and that the resolution of this uncertified question is encompassed in our holding on the certified question, it remains appropriate to append our reservations about the indiscriminate claims made by the dissent for common law witness immunity.
 
 
 57
 First, the immunity of witnesses at common law was not as monolithic as the dissent might suggest. The comprehensive rule announced by Lord Mansfield in 1772 and reproduced in the dissent was not borrowed in its entirety by the majority of American jurisdictions. While most American courts do speak of an absolute witness immunity, they commonly temper the reach of their decisions by imposing a supplementary requirement of pertinency or relevancy. See, e. g., Myers v. Hodges, 53 Fla. 197, 208-09, 44 So. 357, 361 (1907). ("In the United States, according to the overwhelming weight of authority, in order that defamatory words, published by parties, counsel, or witnesses in the due course of judicial procedure, may be absolutely privileged, they must be connected with or relevant or material to the cause in hand or subject of inquiry"); McDavitt v. Boyer, 169 Ill. 475, 48 N.E. 317 (1897); Barnes v. McCrate, 32 Me. 442 (1851), and Cooley v. Galyon, 109 Tenn. 1, 70 S.W. 607 (1902).
 
 
 58
 We cite these authorities not to imply that appellant's answer in this case was not responsive to the judge's question, but only to indicate that the more extreme English rule espoused by Lord Mansfield was not wholeheartedly embraced by most American jurisdictions. Furthermore, despite the broad and dogmatic language employed by many American courts, one does encounter occasional common law opinions which cast some doubt upon the extent to which absolute witness immunity protects knowingly false testimony. See, e. g., Liles v. Gaster, 42 Ohio St. 631, 636 (1885) ("What (a witness') liability . . . may be, if he was guilty of intentional falsehood, and actual malice, we need not here determine, as the case made does not require it").
 
 
 59
 We observe further that the dissent does not refer us to cases which establish the existence and scope of witness immunity under federal common law.[15] As noted earlier (see note 8 supra ), even where common law torts are alleged, the immunity to be conferred on federal officials is governed by a federal standard, which need not be identical to the standard applied in a particular state or even in the majority of states.
 
 
 60
 Finally, it is far from clear that, as the dissent asserts, a witness should enjoy the same measure of immunity, regardless of whether the wrong of which he is accused rises to constitutional dimension. Whatever the precise nature of the immunity accorded to witnesses at common law, that immunity applies without distinction to any individual serving as a witness in a judicial proceeding. On the other hand, where a constitutional infringement is alleged, the defendant-witness will almost invariably be a Government official. (At minimum, the "under color of law" requirement will assure some direct government involvement in the challenged testimony.) This is a crucial difference. Policy considerations counselling the insulation of private citizens from civil liability arising from their performance as witnesses do not apply with equal force when a complaint charges that constitutional rights have been violated by a public employee operating from the witness stand.
 
 
 61
 The unique importance of constitutional rights hardly needs restatement. Both Congress and the Supreme Court have created special causes of action to provide a remedy for official misconduct which infringes constitutionally protected interests. Given this notably solicitous attitude toward the effectuation of constitutional guarantees, it can be asserted with both reason and authority that absolute immunity is not to be extended to the constitutional tort context absent the most compelling justification.
 
 
 62
 Indeed, in Scheuer v. Rhodes, supra, the Supreme Court, confronted with two of its own decisions which accorded federal executive officials absolute immunity from common law damage actions, nevertheless granted only a qualified immunity to high-level state executive officials sued for constitutional violations under § 1983. See 416 U.S. at 247, 94 S.Ct. 1683. Extensive discussion of this point may be found in Judge Celebrezze's dissent from the Sixth Circuit's opinion in the same case, Krause v. Rhodes, 471 F.2d 430, 453-59 (6th Cir. 1972), rev'd, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). See also States Marine Lines, Inc. v. Shultz, 498 F.2d 1146, 1159 n. 12 (4th Cir. 1974); Norton v. McShane, 332 F.2d 855, 860-61 (5th Cir. 1964); Burkhart v. Saxbe, 397 F.Supp. 499, 502 n. 3 (E.D.Pa.1975); and Note, Damages for Federal Employment Discrimination: Section 1981 and Qualified Executive Immunity, 85 Yale L.J. 517-518 & n.54 (1976). But see Brawer v. Horowitz, 535 F.2d 830, 836-37 (3d Cir. 1976) (witness immunity issue only reached after court assumed that private citizen testifying for federal government in criminal prosecution would be amenable to Bivens -type suit seeking damages for deprivation of constitutional rights by a federal official ); Fidtler v. Rundle, 497 F.2d 794, 798 (3d Cir. 1974); Johnson v. Alldredge, 488 F.2d 820, 826-27 (3d Cir. 1973), cert. denied, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974); Bauers v. Heisel, 361 F.2d 581, 586-91 (3d Cir. 1965) (en banc ), cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967), and Hahn v. Sargent, 388 F.Supp. 445, 452 (D.Mass.), aff'd on other grounds, 523 F.2d 461, 467 (1st Cir. 1975), cert. denied, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976).
 
 
 63
 Even where the Supreme Court has followed the common law example in determining that absolute immunity is appropriate in a constitutional tort setting, the Court has explicitly recognized that it was in no way bound by precedent to reach the result it did. See, e. g., Imbler, supra, 424 U.S. at 424, 96 S.Ct. 984; Pierson, supra, 386 U.S. at 554-55, 87 S.Ct. 1213; and Tenney v. Brandhove, 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).
 
 
 64
 Since, for the reasons outlined above, we do not believe that appellant is protected by the absolute prosecutorial immunity described in Imbler, and since we are unable to join in the dissent's interpretation of the impact of witness immunity on this case, the November 20, 1974 order of the District Court denying appellant's motion to dismiss is affirmed.
 
 
 65
 It is so ordered.
 
 
 66
 WILKEY, Circuit Judge, dissenting:*
 
 
 67
 We are confronted at the outset by the inescapable facts that defendant Goodwin is a prosecutor and that the indictment made the subject of this civil suit for damages occurred in the courtroom, the native habitat of judges, jurors, prosecutors and witnesses all of whom having, and from time immemorial having had, absolute immunity from civil suit as essential participants in the judicial process. The normal role of the Prosecutor in the courtroom is as Advocate; his actions are those of a spokesman advocating the cause of his client, the government, state or federal. In this particular case Goodwin perhaps was, for a moment at least, also cast in another role, that of Witness ; his action was to answer a specific question of the court. The plaintiff claims that answer was false, and now sues Goodwin for perjury. Perjury is the act of testifying falsely. It is not the act of "administering" or "investigating" anything.
 
 
 68
 The majority painstakingly reviews the recent decisions on prosecutorial immunity, particularly Mr. Justice Powell's opinion for the Supreme Court in Imbler v. Pachtman,[1] which accord absolute immunity to the prosecutor, not because of his "official status,"[2] but because of "the nature of the official behavior"[3] in his role essential to the judicial process. The cases cited universally hold that the prosecutor while functioning as an advocate (and thus as part of the judicial process) is entitled to absolute immunity; they also either hold, or leave open the question as to exactly where the line is to be drawn (as Justice Powell did in Imbler ),[4] that "administrative" or "investigative" duties of the prosecutor are entitled only to a qualified immunity. The majority opinion agrees.[5]
 
 
 69
 Thus the majority finds it necessary to take Goodwin completely outside the role of prosecutor connected with the judicial function. In the face of the undeniable facts of this case that Goodwin was in the courtroom, before a sitting judge, appearing as counsel of record in a judicial proceeding, actively performing those duties associated with trial advocacy, when he answered a question from the trial judge the majority finds that his answer to the question was not, in the language of Imbler, an "integral part of the judicial process."[6] The starting point for the majority's analysis is the statement in Imbler that "We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom."[7] The Supreme Court goes on to describe what these actions are, and concludes, "At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court."[8]
 
 
 70
 The Court in Imbler thus differentiated between the prosecutor functioning "as an administrator" and "as an officer of the court." On the former the Court reserved decision as to the immunity accorded; on the latter, when the prosecutor is functioning "as an officer of the court," the Supreme Court unequivocally held the prosecutor has absolute immunity.[9] On the facts of Goodwin's case, can the majority deny that he was functioning "as an officer of the court"? Goodwin was in the courtroom before the U.S. District Judge as lead counsel for the United States. Could there be a more classic role "as an officer of the court"?
 
 
 71
 This points up the majority's startling weakness: There is not one word in Imbler, or in any of the numerous other cases cited by the majority, which describes an action similar to that of Goodwin here as being outside the prosecutor's (or witness's) absolute immunity. The only references in Imbler and all the other cases cited talk of "investigative" or "administrative" tasks inherent in the prosecutor's usual job as being outside absolute immunity.
 
 
 72
 My colleagues have apparently found no case which cites, by way of holding or dicta, any action by a prosecutor inside the courtroom as being outside his role of prosecutor.[10] Goodwin's actions were not "actions preliminary to the initiation of a prosecution,"[11] nor were they "actions apart from the courtroom";[12] he was right in the middle of the courtroom and right in the middle of a grand jury proceeding, the time-honored method for "initiating a prosecution."[13] The grand jury is an arm of the court. Goodwin was functioning "as an officer of the court." Goodwin's "activities were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force."[14]
 
 
 73
 To my mind Goodwin was a prosecutor functioning "as an officer of the court," and entitled to the prosecutor's absolute immunity under Imbler v. Pachtman. Yet it is undeniable that Goodwin was sworn as a witness, for a brief moment took the witness stand, and answered one question. My colleagues hold that after Goodwin took the oath as a witness he was acting as an investigator a strange conclusion and, after he took the oath as a witness (in addition to his oaths as attorney and prosecutor) he ceased to be "an officer of the court" to my mind an equally strange conclusion.
 
 
 74
 Both of these conclusions are necessary if the majority is to package Goodwin as an "investigator" or "administrator," for it is only if he can be so labelled that he can be deprived of the absolute immunity of the prosecutor under Imbler and countless other cases. That this is a strained and distorted result should be apparent, as it is so obvious that if Goodwin was not functioning as a prosecutor in his role "as an officer of the court," then he was functioning as a witness and each is entitled to absolute immunity.
 
 
 75
 It thus becomes necessary in these opinions to treat both prosecutorial and witness immunity.[15] I shall first turn to the absolute immunity of the prosecutor as analyzed and affirmed by the Supreme Court in Imbler v. Pachtman (1976), then to the absolute immunity of the witness. To some extent the discussion must interweave, for both are part of the seamless web of immunity held for centuries to be essential to the functioning of an effective judiciary.
 
 
 76
 I. PROSECUTORIAL IMMUNITY "AS AN OFFICER OF THE COURT" WHOSE
 
 
 77
 "ACTIVITIES WERE INTIMATELY ASSOCIATED WITH THE
 
 
 78
 JUDICIAL PHASE OF THE CRIMINAL PROCESS"
 
 
 79
 We are all agreed that Goodwin's action was taken within the scope of his duty; it is further the case, I submit, that his action involved the exercise of significant discretion.[16] He is thus entitled to some sort of immunity protection, qualified or absolute. "The procedural difference between the absolute and qualified immunities is important. An absolute immunity defeats the suit at the outset, so long as the official's actions were within the scope of the immunity. The fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial."[17]
 
 
 80
 The decision whether qualified or absolute immunity is appropriate involves a balancing of the interests which would be benefited and impaired by application of either of the two doctrines. The decisions of the Supreme Court which have made this choice have weighed the incremental loss in litigant rights and remedial relief against the enhancement of governmental functioning resulting from the absolute as opposed to the qualified immunity. As a result of this balancing the Court has devised rules of absolute or qualified immunity for various classes of officials, as defined by function.[18]
 
 
 81
 Our role in applying these rules, where the Court has devised them, is to make a proper characterization of the function being performed by the official in question. Our role, however, is not to engage in a particularistic rebalancing of all the relevant policies to determine whether absolute or qualified immunity is appropriate in this case. Our analysis instead is functional: was this action undertaken in the prosecutor's capacity as an officer of the court, or, put another way, a government advocate in a courtroom setting? If this prosecutor should be so characterized, then he is entitled to absolute immunity under Imbler v. Pachtman. In Imbler the Court itself balanced the competing policies and mandated absolute immunity for the prosecutor in his role, very broadly conceived, as courtroom advocate.
 
 
 82
 A. Imbler v. Pachtman Balancing of the Interests Held to Require Absolute Immunity for the Prosecutor.
 
 
 83
 In order to make a more informed application of the Imbler rule, it may be helpful to set out the policies which underpin it. While our role, as noted, is not to make a de novo balancing of these policies in this case, an understanding and appreciation of the policies may contribute to a proper characterization of the prosecutor's protected role under Imbler. At the outset the Imbler Court recognized that § 1983, although it creates a cause of action for deprivation of constitutional rights, does not constitute a flat bar to immunity doctrine,[19] and proceeded to consider the other factors, which, under its balancing approach, related to the choice of qualified or absolute immunity.
 
 
 84
 Recognizing the prosecutor's absolute immunity at common law from actions for malicious prosecution, the Court found equally applicable to actions under § 1983 the several rationales for this common law immunity.[20] Most importantly these included the "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust."[21] The Court noted that these twin hazards of diversion of energies and biasing of decision-making are, for several reasons, especially acute in the case of a prosecutor. Acting as he does under serious constraints of time and information, a prosecutor would "face greater difficulty in meeting the standards of qualified immunity than other executive or administrative officials."[22] Further, the sheer number of decisions which a prosecutor must make that "could engender colorable claims of constitutional deprivation" means that a demonstration of good faith in every case "could impose unique and intolerable burdens . . . ."[23]
 
 
 85
 The net harm of allowing only a qualified immunity in the performance of prosecutorial functions was not confined, therefore, to the "substantial danger of liability even to honest prosecutors,"[24] or even to the expenditure of great time and effort in defending such suits. Most seriously, the denial of absolute immunity would adversely affect "the functioning of the criminal justice system as a whole." "(T)riers of fact . . . often would be denied relevant evidence" by the creation of a systematic bias in the prosecutor against incriminating evidence of sufficiently uncertain pedigree as to support a colorable cause of action.[25] And post-conviction review procedures might well be biased in quite another way, against the convicted person, by "knowledge that a post-trial decision in favor of the accused might result in the prosecutor being called upon to respond in damages for his error or mistaken judgment."[26]
 
 
 86
 As final support for its holding that prosecutors are absolutely immune "in initiating a prosecution and in presenting the State's case,"[27] the Court noted that the unavailability of suit under § 1983 for this category of cases "does not leave the public powerless to deter misconduct or to punish that which occurs" for "a prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers."[28] As a deterrent of even greater weight, "(t)his Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law."[29] Taking all these policies into account, the Court concluded, on balance, that for § 1983 damage suits, as at common law, a prosecutor's actions "intimately associated with the judicial phase of the criminal process" were entitled to absolute immunity.[30]
 
 
 87
 B. Application of Immunity Doctrine to Goodwin.
 
 
 88
 We thus come to the question of whether defendant Goodwin's sworn testimony, to the effect that none among the witness group represented by counsel was a Government informant, falls within the absolute prosecutorial immunity from damage actions established by the Supreme Court. As developed in the introduction, it would surely seem on its face that Goodwin's action during grand jury proceedings in answering a question from the judge in his capacity as lead prosecutor was action taken as an "officer of the court."[31] This was action within his scope of duty which called for the exercise of discretion in its performance, precisely the type of "quasi-judicial" function within the absolute protection of Imbler.[32]
 
 
 89
 In order to divest Goodwin of his protected prosecutorial function, the majority discusses at length numerous cases contrasting the prosecutor's advocacy role with his duties related to investigation and administration. By page --- of 186 U.S.App.D.C., at p. 21 of 569 F.2d the majority is ready to state:
 
 
 90
 . . . (W)e believe that appellant's false statement to the federal district court in Florida is properly characterized as an act of investigation rather than advocacy. . . . (A)ppellant's alleged perjury bears no relation whatever to the advocate's role as conceived by the Supreme Court in Imbler.[33]
 
 
 91
 Indeed?
 
 
 92
 This rather extraordinary characterization is not supported by the "investigatory" cases cited by the majority. This characterization, moreover, rests upon a clear misreading of how the Imbler rule should be applied and upon an overly narrow reading of its conception of advocacy. These points will be developed in order below. Finally, as I will explain in more detail in Part I, C, infra, the attempted division of the prosecutor's function with the grand jury into "investigative" and "advocacy" roles is legally inaccurate and practically unworkable.
 
 
 93
 1. The characterization of Goodwin's action as "investigatory" is unprecedented and unjustified.[34] As a matter of case law, including all the cases cited by the majority, courts have characterized as "investigatory" those actions outside the courtroom setting where the prosecutor is acting in a capacity akin to the police officer in his efforts, for example, to obtain a confession,[35] or to make arrests,[36] or to execute a search warrant.[37] Indeed, the Imbler Court cited to the cases of policemen's functions, all involving activities apart from the courtroom, to show what it meant by "investigative" activity by prosecutors.[38] The majority's view of this courtroom activity as "investigatory" under Imbler is thus absolutely novel under the case law.
 
 
 94
 The majority's characterization, moreover, is not justified by the reasoning of the cases cited by Imbler. In Hampton v. City of Chicago,[39] for example, Judge (now Justice) Stevens recognized that since a police officer is entitled to only qualified immunity for his police actions, then a prosecutor performing the functions of a police officer should also be accorded only qualified immunity because "it seems neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." This concern for symmetry of treatment appears as a critical policy for the majority as well: "Regardless of his official status, a prosecutor functioning primarily as an investigator should be accorded only the qualified immunity typically conferred on other investigative officers."[40]
 
 
 95
 In the instant case, however, a fair application of symmetry calls for absolute immunity for the prosecutor's courtroom statement. Goodwin need not be given qualified immunity because a policeman, if a witness, would only get qualified immunity; on the contrary, in my view a policeman functioning as a witness in a manner similar to Goodwin would be entitled to absolute immunity. The majority has not cited and cannot cite any case in which an official, as a witness, has been denied absolute immunity from a civil damage suit. See Part II, infra. Indeed, if the majority were to afford a policeman, qua witness, absolute immunity but deny it to this prosecutor, giving a similar answer, then Goodwin would be denied absolute immunity solely because of his official status, surely an impermissible result. If a policeman should have absolute immunity here, functioning as a witness, so too should Goodwin, functioning as an officer of the court.
 
 
 96
 Besides the concern for symmetry of treatment in the performance of similar tasks, the other basic rationale in the "investigatory" cases is that the prosecutor acting like a policeman outside the court should be afforded only qualified immunity because there is no other appropriate way for there to be "judicial surveillance" of this type of executive action. Apton v. Wilson.[41] Put the other way, as Judge Leventhal did in Apton, the prosecutor acting within the confines of the court is entitled to absolute immunity as a "quasi-judicial officer" because "the circumstances typically provide alternative instruments of the judicial branch to check misconduct the discretion of the grand jury, the procedures of a trial, and the potential sanction of discipline imposed by the court itself."[42]
 
 
 97
 Judged by the reasoning of Apton, it should seem that Goodwin is clearly entitled to absolute immunity, as his allegedly false statement was made directly under the control of the trial judge, a classic instance of "judicial surveillance." The majority, however, seeks to distinguish the reasoning of Apton because, it says, the circumstances of this case did not in fact provide for careful scrutiny of Goodwin's action. See at --- - --- of 186 U.S.App.D.C., at 24-25 of 569 F.2d. To begin with, the language from Apton does not suggest in any way that absolute immunity for a "quasi-judicial officer" should turn on a particularistic inquiry into whether in fact there was a full and fair "judicial surveillance."[43] Instead, it is the opportunity and potential for "judicial surveillance" that justifies absolute immunity for prosecutorial activity in a courtroom setting. That the majority is misreading the nature of absolute "quasi-judicial" immunity will become apparent from a close comparison of its rationale with Imbler.
 
 
 98
 2. Two of the reasons that the majority gives for why absolute immunity is not appropriate in this case are based upon a clear misreading of Imbler. The majority asserts, first of all, that there has yet been no apparent official inquiry into this alleged misbehavior, and, secondly, that the alleged perjury here was insulated from probing examination and jury appraisal. As I will show, these are not material factors under Imbler, even assuming their accuracy, as to whether this prosecutor was acting as an "officer of the court."
 
 
 99
 Consider first the issue of whether there has been any professional or judicial inquiry into Goodwin's action. In striking the balance in favor of absolute immunity, the Imbler Court[44] regarded as significant factors "(the) amenability (of a prosecutor) to professional discipline by an association of his peers" and the possibility as well of "criminal punishment of a prosecutor." The existence of these checks, the Court emphasized, thus "does not leave the public powerless to deter misconduct or to punish that which occurs."[45] In this case the majority holds that because there has been no professional or judicial inquiry after all this time, it is appropriate to allow an inquiry now in this suit for damages. This outcome rests on a misunderstanding by the majority about the nature of the Supreme Court's analysis in Imbler. The Court was weighing the general policies behind absolute as opposed to qualified immunity in order to arrive at the functional rule of absolute immunity for the prosecutor in his role as advocate. By weighing in the balance the amenability of a prosecutor to alternative sanctions, the Court did not mean that the availability of absolute immunity from civil damage suits in each case should turn on a particularistic determination of whether the prosecutor's act in question had otherwise been the subject of a disciplinary inquiry. Indeed, the Imbler Court did, in fact, grant absolute immunity to the individual prosecutor, Mr. Richard Pachtman, without anywhere indicating whether he had been subject to disciplinary inquiry in the many years between the trial in 1961 and the Court's award of absolute immunity in 1976. Similarly, it is immaterial whether Goodwin's action has in fact been subject to disciplinary review. Rather, what the Imbler Court emphasized is that there had existed the possibility of alternative checks, citing to the relevant sections of the ABA Code of Professional Responsibility and the California Penal Code. So too here, there is no question that there has existed the potential for professional, criminal or judicial inquiry into his action, thus bringing him within the analysis of Imbler.[46]
 
 
 100
 As a matter of immunity doctrine, moreover, there is real wisdom in not having the choice between immunities turn on a determination of whether this action in particular was subject to disciplinary review. A fair assessment of this factor may have to involve further proceedings and findings, a possibility which undercuts the purpose of absolute immunity, to provide protection at the outset from trial and liability. In this case, for example, it is not altogether clear that there was no apparent official inquiry into the seeming misstatement, as the majority asserts.[47] At the criminal trial of appellees, the trial court held an evidentiary hearing before admitting the informant, Poe, as a witness. Based on evidence received at the hearing, and over the objections of appellees that their Fifth Amendment right to Due Process and their Sixth Amendment right to counsel had been violated, the trial court permitted Poe to testify. Was the court's ruling at all based upon its view that Goodwin's answer was not perjury or did not violate the Constitution? The record in the criminal case is not before us and so the question must go unanswered.
 
 
 101
 Yet if the trial court did face there the issue of the alleged perjury which is very plausible since the appellees here were the defendants there then the majority may be unfairly and inaccurately assuming that there has been no official inquiry. For a more precise assessment of its assumption, the majority would have to have a remand on this issue, to allow for further proceedings, all this taking place, I repeat, even before the choice of immunities is made. And yet, without a remand on whether there had been an official inquiry at the criminal trial into the alleged perjury the majority may be denying Goodwin absolute immunity on the basis of an unfair and inaccurate assumption, as well as one that is immaterial.
 
 
 102
 Furthermore, the majority overlooks the important possibility that the lack of any official inquiry may itself reflect some oversight by other parties. My thought is that the Department of Justice and the District Judge are well aware of the facts on the merits of this case,[48] and that in their opinion the claim of plaintiff Briggs has no merit, hence no action has been taken. It is worth noting also that since the courtroom incident we have had two Presidents and several Attorneys General, of different political persuasions. How does the majority take into account the possible scrutiny by all these people, short of a formal "official inquiry," and their possible judgment that action against Goodwin was not warranted? If Goodwin is to be denied absolute immunity because nobody has reviewed his alleged misbehavior, then the majority must not totally overlook, as it does, the important possibility that the relevant parties have exercised some oversight and have decided against further inquiry.
 
 
 103
 The short of it is that it is unwise to make absolute immunity turn on whether there was in fact alternative review of the incident in question. Such an inquiry, as demonstrated by this case, may raise evidentiary and other issues that must be resolved even before the choice of immunities can be made. The greater the number of issues that are injected into this choice, beyond the necessary issues of scope of duty and discretionary act, the more the protection of absolute immunity the dismissal of a suit at the outset is eroded. It was thus very appropriate for the Imbler Court not to consider whether that prosecutor had been called to answer for his alleged courtroom misdeeds. We should, and must, follow their example: it is immaterial whether there was ever an "official inquiry" into Goodwin's alleged perjury.
 
 
 104
 The other argument of the majority is that because Goodwin's statement was "insulat(ed)" from appraisal by the jury and further inquiry by the appellees, it is inappropriate to accord absolute immunity in this case.[49] Once again, this outcome rests upon a misreading of Imbler. As mentioned earlier,[50] Justice White in a separate opinion argued that there should be only qualified immunity for the unconstitutional withholding of information from the court. When a prosecutor suppresses evidence, Justice White contended, it is, by definition, not subject to the scrutiny of the judicial process; thus, there is "no way to prevent or correct the constitutional violation."[51] Note the similarity to the majority's view that absolute immunity is inappropriate here. For example, the majority points out that "appellees and their counsel were required to accept appellant's representation on faith,"[52] which meant, in Justice White's terms, that there was "no way to prevent or correct the constitutional violation."[53]
 
 
 105
 The short answer to the majority's view that Goodwin's "insulat(ed)" answer loses absolute immunity is that the Imbler Court expressly rejected Justice White's separate view that the total suppression of evidence warranted only qualified immunity.[54] Thus, under Imbler it is immaterial to the choice of immunities whether Goodwin's allegedly false statement during judicial proceedings was not adequately tested by cross-examination or by jury appraisal.
 
 
 106
 Moreover, viewing this case in terms of the suppression of evidence, the Imbler Court's rejection of Justice White's separate approach may be said to settle and control this case. One of the policies justifying absolute prosecutorial immunity is that otherwise "the triers of fact in criminal cases often would be denied relevant evidence."[55] By rejecting Justice White's view that an unconstitutional withholding should not warrant absolute immunity, the Imbler Court was essentially saying that in all the decisions about presenting evidence to the court the prosecutor would have absolute immunity. This would include decisions to present evidence of dubious reliability as well as decisions not to present particular evidence at all. In these terms, what Goodwin allegedly did, in essence, was decide not to present the court with the evidentiary fact that there was a government informant among the witnesses. Since this decision entailed an element of judgment (giving the framing of the question from the trial court), it is a decision about presenting evidence, in this case from himself as witness and counsel, that is basically the subject of this suit.
 
 
 107
 Imbler afforded protection for the full range of decisions about presenting or withholding evidence. Once again, we should, and must, follow its guidance: it is immaterial whether Goodwin's decision, to withhold evidence, was shielded from cross-examination, or the other "corrective" aspects of the trial process.
 
 
 108
 3. Central to the majority's conclusion denying absolute immunity to this prosecutor is its view that his "alleged perjury bears no relation whatever to the advocate's role as conceived by the Supreme Court in Imbler."[56] As discussed above, this conclusion disregards whether his alleged perjury bears a relation to his role as an officer of the court (which he may be, even though not an "advocate" in the most narrow sense) under Imbler or to his role as witness, both of which roles are entitled, I submit, to absolute immunity. But even considering solely the advocacy role for the moment, the majority finds no relation to advocacy only by adopting a much more narrow view of the advocate's role than was conceived and applied in Imbler. If the advocate's role as defined in Imbler and the circumstances of this case are properly understood, Goodwin's response to the question may fairly be seen as a necessary part of his advocate's role.
 
 
 109
 The Imbler Court meant for the advocate's role to be read very broadly. Not only did Imbler go out of its way to say in dicta that the role extended to "actions preliminary to the initiation of a prosecution and actions apart from the courtroom,"[57] but also in disposing of the case it found actions to be advocacy which, at first glance, appeared more to be investigation. Having already shown that the broad language of the dicta appears to bring his alleged perjury within the ambit of Imbler,[58] let us focus here on how the treatment of the precise facts of Imbler also establishes that the action of Goodwin comes within the broad definition of advocacy.
 
 
 110
 The starting point for the relevant analysis is footnote 32 of Imbler, which discusses seemingly "investigative" activity. Because of the importance of the footnote to following the analysis, it is reproduced in full below in the text. (Costello, a central character in the footnote, was the primary identification witness at the trial of Imbler).[59]
 
 
 111
 Both in his complaint in District Court and in his argument to us, petitioner characterizes some of respondent's actions as "police-related" or investigative. Specifically, he points to a request by respondent of the police during a courtroom recess that they hold off questioning Costello about a pending bad-check charge until after Costello had completed his testimony. Petitioner asserts that this request was an investigative activity because it was a direction to police officers engaged in the investigation of crime. Seen in its proper light, however, respondent's request of the officers was an effort to control the presentation of his witness' testimony, a task fairly within his function as an advocate.
 
 
 112
 The action at issue in the above footnote was the prosecutor's request of the police that at that time they not question Costello, the prosecution's witness, about a pending criminal charge. Ordinarily, requests and directions about police interrogation would be considered acts of investigation. However, the prosecutor's request was deemed an act of advocacy in Imbler because his concern about the interrogation was that it might impair the remainder of Costello's testimony. Following police interrogation, Costello might be nervous, and a less effective witness. Or after such interrogation, he might become less cooperative as a government witness or even refuse to cooperate at all.
 
 
 113
 Applying this reasoning to the instant case, it also appears that the act of claimed perjury should be taken as advocacy. Given that the object of the asserted perjury was to avoid disclosing the existence or identity of the government agent, that meant, since the concealment was accomplished, that the agent was able to appear at trial as a witness and did appear without his existence or identity known to the defendants beforehand. As a result, the presentation of the witness's testimony was very likely more effective, much as Costello's testimony was possibly made more effective due to the postponement of police interrogation. Seen in this light, Goodwin's act of alleged perjury can be taken as an effort to preserve the more effective use of a witness at trial.[60] As in Imbler, Goodwin's act was even more clearly not removed from the judicial process, being in court, relating to a grand jury proceeding, and should be considered as relating to the other advocacy duties of his grand jury function.
 
 
 114
 C. The Majority's Extraordinary Misconception of the Prosecutor's Role With the Grand Jury
 
 
 115
 After its discussion of cases making the distinction between the advocacy role of the prosecutor and his sometime "investigative" or "administrative" duties, the majority opinion then develops the argument that Goodwin's performance of his duties as a prosecutor with the grand jury was in this case, although not necessarily in other instances of his work with the grand jury, properly characterized as "investigative" in nature rather than being connected with his role as an advocate. I respectfully suggest that the entire development of this argument in the majority opinion is founded on a total misapprehension of the relationship of the prosecutor to the grand jury and a misconception of the grand jury's role itself. The distinctions attempted to be drawn are demonstrably legally incorrect and, to anyone who has ever worked with a grand jury, totally impossible to apply as a matter of practicality.
 
 
 116
 Since the exposition of the underlying rationale of the majority on this point is spread over several pages, I shall quote certain excerpts so that the majority rationale will be unmistakably clear. "We are aware that earlier cases in which prosecutorial behavior has been termed investigative have involved factual situations distinct from that currently before us. (P. --- of 186 U.S.App.D.C., p. 23 of 569 F.2d) . . . (W)e think that, in a real sense, this litigation concerns behavior more plainly investigative than that encountered in some of the earlier cases cited above. (P. --- of 186 U.S.App.D.C., at p. 23 of 569 F.2d) . . . The grand jury (in Goodwin's case) was to function in the first instance as an investigative tool, rather than in its more familiar guise as a deliberative body deciding whether to return indictments for specific crimes on the basis of evidence gathered and presented by a public prosecutor. (P. --- of 186 U.S.App.D.C., p. 24 of 569 F.2d) . . . The ongoing character of the grand jury process in this case helps to convince us that appellant had embarked on what was fundamentally a factfinding mission, and that his false statement to the court, if such it was, was intended to improve the prospects for that endeavor's success." (Pp. --- - --- of 186 U.S.App.D.C., p. 24 of 569 F.2d) (emphasis supplied).
 
 
 117
 The majority thus tries to divide grand jury functions into "investigative" and "deliberative." There is that distinction, but the way the majority defines and separates it, it is completely erroneous and misleading here. Let me see if I can dispel the confusion:
 
 
 118
 1. The grand jury does not have a "more familiar guise as a deliberate body" and another role as "an investigative tool." The grand jury ALWAYS has both roles of hearing evidence (investigating) and then deciding whether to return an indictment (deliberating).
 
 
 119
 2. The prosecutor's only role with the grand jury is during the time that it is hearing evidence, i. e., investigating. His usual duty at that time is to interrogate witnesses, much as he does in the courtroom.
 
 
 120
 3. The prosecutor never has a role with the grand jury while it is functioning as a "deliberative body." By law he is excluded, as is everyone else, from the grand jury during this time. Federal Rules of Criminal Procedure 6(d). His presence or assistance to the grand jury during the time it was functioning, in the words of my colleagues, "in its more familiar guise as a deliberative body," would be grounds for quashing an indictment.
 
 
 121
 4. The majority deprives the prosecutor here of his absolute immunity because he was performing duties with the grand jury which was then functioning "in the first instance as an investigative tool," but they do not seem to realize that this is the only role for the prosecutor with the grand jury. The majority never presumes to exclude the prosecutor at all times from his absolute immunity when he is working with the grand jury. The opinion tacitly assumes that the prosecutor, when working with the grand jury in what the majority considers his normal prosecutorial functions, is clothed with his usual absolute immunity as a prosecutor, because they recognize a good part of the prosecutor's duties is in assisting the grand jury, an arm of the court. Certainly in performing this function the prosecutor would, in the language of Imbler, be functioning "as an officer of the court" whose "activities were intimately associated with the judicial phase of the criminal process." The majority itself states, "The cases collected by appellant hold unanimously that a prosecutor is entitled to absolute immunity for his quasi-judicial activities. After Imbler, this joint is incontestable." (P. --- of 186 U.S.App.D.C., at 22 of 569 F.2d.)
 
 
 122
 5. What the majority is trying to do here is to make a distinction between those cases brought before the grand jury which require very little evidence, or very little original evidence before the grand jury, as the basis of an indictment, and those cases which require a great deal of evidence, some of which may be heard by the prosecutor for the first time. The majority seems to think that, simply because the matters which were to be heard by this particular grand jury in Florida were estimated to require considerable time and perhaps to consist of evidence not hitherto heard by the prosecutor or anyone else, somehow the prosecutor was no longer functioning in his same role. Necessarily, the majority also tries to redraw the line between the grand jury's roles of hearing evidence (investigation) and deliberation (discussing and voting on indictments). The majority does this by apparently classifying simple cases with short routine presentations of evidence as being "in (the grand jury's) more familiar guise as a deliberative body deciding whether to return indictments for specific crimes on the basis of evidence gathered and presented by a public prosecutor." (P. --- of 186 U.S.App.D.C., p. 24 of 569 F.2d)
 
 
 123
 6. The attempted split of the prosecutor's role, depending on how much or how little evidence, and whether he has heard it before or not, is totally erroneous and confusing. The attempted split of the grand jury's role, between on the one hand complicated cases in which it assists in ferreting out the true facts of the case as well as hearing evidence of which the prosecutor was already aware, and on the other hand cases in which the grand jury functions as a deliberative body, which according to the majority now includes both hearing evidence "gathered and presented by a public prosecutor" and its secret deliberations on evidence in any type of case, is likewise totally erroneous and confusing. The grand jury is never in a "familiar guise as a deliberative body" when it is hearing any evidence no matter how routine the presentation. Nor is the prosecutor ever assisting the grand jury in its "familiar guise as a deliberative body" such action, as the majority describes it, would invalidate every indictment.
 
 
 124
 7. Aside from its misconception of the functions of the grand jury, and its attempt to redraw the line between those functions, now clearly drawn by law, the majority's idea of dividing the functions of the prosecutor with the grand jury into two separate parts, one apparently his role in a routine case and the other in a more elaborate case requiring original work with the grand jury, is utterly impractical. There is no possible line of distinction to be drawn between different types of cases as the majority apparently thinks there is.
 
 
 125
 Cases before a grand jury run the gamut from a simple narcotics possession case, which may require only the testimony of the arresting officer, elicited by questions from the prosecutor, after which an indictment is speedily voted while the prosecutor is getting a glass of water at the nearby water cooler, to a very complicated income tax fraud or mail fraud case in which reluctant or fearful witnesses may have declined to talk to federal investigative agents, but do testify before the grand jury under the questioning of the prosecutor cases that may require weeks and weeks of testimony before the grand jury.
 
 
 126
 In between are every shade and variation of case in which the advocacy skill of the prosecutor is called upon to assist the grand jury. There is the simple fraud case, in which the witnesses before the grand jury may be only one investigator and three victims defrauded, after whose testimony the prosecutor may inform the jury that ten other fraud victims are available to testify if the jury wishes to hear them, but what they will say has been summarized by the investigator. Then there is the same type case in which one or two witnesses may be reluctant to testify for fear of incriminating themselves. This necessitates not only the presentation of the investigators' and the victims' evidence, but perhaps a trip before the district judge to secure a grant of immunity for the witness, and his second appearance before the grand jury, at which time he responds to the prosecutor's questioning and testifies. Then there are situations in which, although a complete investigation has been done by the regular federal investigative agents, at the last minute before the presentation of evidence to the grand jury the prosecutor learns of an additional witness who could throw light on the case, and he promptly puts this witness before the grand jury without any preliminary questioning by anyone whatsoever.
 
 
 127
 The examples of different shades of the prosecutor's questioning, of different degrees of the prosecutor's assistance to the grand jury, of differing combinations of the routine and the bizarre in the presentation of testimony before the grand jury by the prosecutor, could be multiplied without end. There is absolutely no line which can be drawn to separate the prosecutor's role in the more routine case lasting a few minutes from that in which original testimony is heard by the grand jury over a period of weeks, for there is every variation and combination in between. In every case the prosecutor is assisting the grand jury in hearing evidence, the investigative phase of the grand jury's work. The degree of his assistance is of incalculable variety and description, but in no case in no case does the prosecutor assist the grand jury "in its more familiar guise as a deliberative body."
 
 
 128
 8. The majority throughout stresses the advocacy function of the prosecutor as that which is entitled to absolute immunity. For example, "(T)he Court . . . reaffirmed its fundamental reliance on the advocate's role as the source of the absolute prosecutorial immunity applied in Imbler." (P. --- of 186 U.S.App.D.C., p. 19 of 569 F.2d) Ironically, for the validity of the majority's logic, it is precisely in the long, complicated grand jury case, on which the majority here rests its denial of absolute immunity to the prosecutor, that the prosecutor functions most as an advocate, most similar to his role in court. In the utterly routine case, such as the simple narcotics possession mentioned above, the prosecutor may introduce the arresting officer to the grand jury and only ask him one question, "Officer, just tell the grand jury in your own words what happened." And the officer does so without the necessity of any further interrogation by the prosecutor.
 
 
 129
 In direct contrast, if the grand jury is engaged in a long and protracted inquiry, in dealing with witnesses who have not been previously examined by investigators, or dealing with witnesses who are recalcitrant, the skills of the advocate in cross-examination, knowledge of what is relevant and irrelevant, his sense of when a witness is concealing something or fabricating all of these skills of an advocate come into play for the prosecutor in assisting the grand jury, the arm of the court. Strangely, because Goodwin was engaged in assisting the grand jury in such an inquiry, the majority wishes to term his actions "investigative," and deny him his status as an "advocate" entitled to absolute immunity, which the majority would grant him if he were presenting to the grand jury a one gram narcotics possession case!
 
 
 130
 Surely, the prosecutor is functioning as an officer of the court and in direct relation to the judicial phase of the criminal process in any case in which he works with the grand jury irrespective of complexity, length of time, number of witnesses, or whether the witnesses have been interviewed before. Yet, most ironically, it is precisely in the type case in which the prosecutor utilizes his talents of advocacy, the type case the majority says the grand jury and Goodwin had here, in which the majority would deny the prosecutor absolute immunity.
 
 
 131
 9. It is apparent that only if the majority wants to deny all prosecutors absolute immunity for all their work with the grand jury could the majority's position be logically coherent. And this bold stroke the majority has not essayed.
 
 
 132
 The true distinction between the prosecutor acting as an officer of the court and his acting in an investigative role is one which the majority opinion does not describe, but which is inherent in the Supreme Court's opinions in Imbler and in other cases. When the prosecutor examines a witness before the grand jury, whether he asks one question or five hundred, he is functioning as an officer of the court and his activities are intimately associated with the judicial phase of the criminal process. I submit this is undeniable. When the prosecutor goes out to the residence of a potential witness and interrogates him there, then he is functioning in what the majority ought properly to describe as the role of an investigator. On the point reserved in Imbler and on the issue decided in a few cases, then and then only the prosecutor may not have the absolute immunity which clothes his every action as part of the judicial process. When he is interrogating a possible witness outside the courtroom or the grand jury room, then he may be filling the role of a policeman or investigative agent and be clothed with whatever immunity they possess. This we do not need to decide here, any more than the Supreme Court decided the issue in Imbler.
 
 D. The Prosecutor Divested
 
 133
 The rationale of the majority opinion throughout has been, first, to designate the grand jury work on the day the incident occurred in the courtroom as being "investigative" in character and not "deliberative"; secondly, to associate Goodwin with the grand jury acting in its non -deliberative role (assuming that the prosecutor could be associated with the grand jury in its deliberative role!); and then, finally, saying that his response to one question from the judge in the courtroom was in connection with his work with the grand jury, and this grand jury's task was "investigative," to deny the prosecutor his absolute immunity.
 
 
 134
 Four quick points highlight the total lack of precedent for my colleagues' decision today:
 
 
 135
 1. No case cited in the 37-page majority opinion ever held that any prosecutor's action in the courtroom was "investigation" or "administration," or was entitled to anything less than absolute immunity.
 
 
 136
 2. The "proper line" drawn in Imbler was between the prosecutor's responsibilities "as an administrator" and those "as an officer of the court," and every action of a prosecutor described by the Supreme Court as "administrator or investigative officer" was outside the courtroom and courthouse.
 
 
 137
 3. The Supreme Court has never held that "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate"[61] are entitled to less than absolute immunity, and the issue was specifically not decided in Imbler.
 
 
 138
 4. No case cited in the 37-page majority opinion confers anything less than absolute immunity on any person for his statements from the witness stand.
 
 
 139
 Summing up Goodwin's role as a prosecutor in the incident made the basis of plaintiffs' suit for perjury: only because Goodwin was lead counsel for the Government in court was he singled out as the person to be asked the question; there was only one question and one answer, made from the witness stand rather than from the counsel table; at the time Goodwin was in the courtroom, before a U.S. district judge, in his prosecutorial advocate's role as an officer of the court in a hearing connected with a proceeding before the grand jury, an arm of the court. How Goodwin's role can be considered anything but that "as an officer of the court" or his actions be deemed not "intimately associated with the judicial phase of the criminal process, and thus . . . functions to which the reasons for absolute immunity apply with full force,"[62] is beyond my ready comprehension. But my colleagues assert that for one critical moment Goodwin was transformed in his appearance as a witness into something else, that since the one question had to do with a grand jury "investigation," he was thereby taken out of the "advocacy" rule of Imbler. Whether that be true or not, yet it seems undeniable that in answering a question under oath Goodwin was also functioning as a witness, another source of absolute immunity to which we now must turn.
 
 II. WITNESS IMMUNITY
 A. The Prosecutor-Witness Transformed
 
 140
 The way that the majority divests Goodwin of his absolute immunity as courtroom advocate is by casting him as a courtroom investigator, entitled only to the qualified immunity of the policeman. Let us focus again on the critical passage of the majority opinion:
 
 
 141
 . . . (W)e believe that appellant's false statement to the federal district court in Florida is properly characterized as an act of investigation rather than advocacy. . . . (A)ppellant's alleged perjury bears no relation whatever to the advocate's role as conceived by the Supreme Court in Imbler.[63]
 
 
 142
 If Goodwin departed from his role as an Advocate (and I agree, it is what he is doing not his title as prosecutor which confers immunity), he did so only to become a Witness, and a witness in court likewise has absolute immunity from civil suit. The very suit for damages brought here alleges perjury by Goodwin; perjury is an action peculiarly tied to witnesses; the perjury here is alleged to have occurred in court; perjury has nothing to do with "investigative" or "administrative" activities, which are contemplated by all the cases to occur outside the courtroom. The majority opinion itself grudgingly admits, "Although he was called upon by the court to make a representation of fact in a courtroom after being sworn . . . ."[64]
 
 
 143
 Continuing with my colleagues' own language, they speak of "appellant's false statement" and "appellant's alleged perjury." When they assert such action "bears no relation whatever to the advocate's role," they have some reason for the distinction; but perjury certainly bears every relation to the witness's role !
 
 
 144
 My colleagues are the victims of their stage props. For almost 20 pages they have been setting the stage with language from various cases distinguishing between the prosecutor's role as advocate and his other duties, cases which hold or suggest that the other duties are not necessarily protected by the prosecutor's admitted absolute immunity as an advocate. The problem of my colleagues is that these other duties are all described as "investigative," "administrative," and of similar nature. There is not one word cited that would exclude anything done by the prosecutor in assistance in the judicial process in court from the protection of absolute immunity. There is, of course, not one word about the prosecutor stepping into the role of witness another universally held position accorded absolute immunity from civil liability. So, in an effort to take Goodwin's action outside this protection, when the majority comes to its conclusion, it is necessarily expressed in the magic language of the cases a "false statement" becomes "an act of investigation rather than advocacy."
 
 
 145
 The obligation to disclose, as a sworn witness, information about informants may, in a narrow sense, be "foreign to advocacy," as the majority suggests,[65] but the actions of a witness do not, therefore, automatically become "investigative," stripped of absolute immunity. For to the extent Goodwin departed the prosecutor's role at all, it was to become a witness. But whether Goodwin be considered primarily a witness or a prosecutor, how a person performing the role of prosecutor could detach himself from the absolute immunity which that function historically has always enjoyed by the temporary assumption of the role of a witness, when that function in the court's process has likewise always historically enjoyed an absolute immunity, was beyond my imagination until after reading the majority opinion. Looking at three centuries of decisions granting absolute immunity to both prosecutor and witness, I would have thought that the immunity of the prosecutor was reinforced by the immunity of the witness, not derogated.
 
 
 146
 The majority, however, manages to divest Goodwin of both immunities. Prosecutorial immunity is lost because Goodwin is characterized, without support from case law, as an "investigator" although any casual bystander (and perhaps even the trial judge) in that courtroom would have sworn that he had seen a lawyer at work, indeed, a prosecutor functioning as an advocate, and, yes, he had also seen and heard that prosecutor testify briefly. And witness immunity is lost because the majority holds here that absolute witness immunity should never be available in a § 1983 or Bivens -type suit. The consequences of this extraordinary step, a rule of qualified immunity for witnesses adopted for the first time, which clashes directly with the one other precedent from a circuit,[66] deserves careful attention before proceeding further.
 
 
 147
 B. Extraordinary (and Apparently Unforeseen) Consequences of a Qualified Immunity Rule for Witnesses
 
 
 148
 The first implication is that any and all state and local officials who testify "under color of law" will have no absolute immunity in their capacity as witnesses in suits for damages to constitutional rights under § 1983. For the majority expressly states, "The immunities enjoyed by state officials sued under § 1983 are governed by federal law."[67] Since, in this Bivens -type case, the majority holds that witness immunity is never available for a federal official as a matter of federal law, it follows that state and local officials, who must look to federal law in § 1983 suits, will also be unable in any circumstance to avail themselves of absolute witness immunity. Neither my colleagues nor I can calculate the practical impact of the majority's rule, but there are undoubtedly countless federal, state and local officials who regularly testify in judicial proceedings who are now stripped of any possible defense of absolute immunity in their capacity as witnesses. What the majority leaves for each official is whatever underlying immunity he may have in his original capacity, which, of course, may vary from witness to witness and may vary even within the testimony of a single witness.[68]
 
 
 149
 Another implication of the majority's rejection of absolute witness immunity is that an official who testifies now stands subject to the full range of damage suits for deprivation of constitutional rights. In this case Goodwin is charged with injury to the Sixth Amendment right to counsel due to his alleged perjury. The majority sets no limits on the "constitutional torts" that a witness may be held liable for, now that the absolute immunity qua witness is taken away. Causes of action against a witness for what he said on the stand come readily to mind. As exemplified in the notes below, violations of the Fourth, Fifth and Sixth Amendments, actionable for damages, may well stem from perjury,[69] and violations of the First and Fourteenth Amendments, also actionable for damages, may even arise from true statements.[70]
 
 
 150
 Once again, neither my colleagues nor I can envision the full practical impact of bringing an increased scope of liability to the witness stand, but the majority's new rule surely bears implications, only partially suggested here, that summon the majority to a much fuller consideration of the witness immunity. Before turning completely to the issue, I note with regret that the majority totally abstains from any consideration of the policies behind witness immunity, only noting that they "do not apply with equal force" when a constitutional violation is alleged.[71]
 
 
 151
 C. Absolute Immunity for Witnesses Supreme Court Precedent, Logic, Policy, and History
 
 
 152
 In considering whether a witness should be accorded absolute immunity in a Bivens -type suit or any other, it must be emphasized that historically all of the essential participants in the judicial process enjoyed an absolute immunity from civil suit for their words and actions relevant to the judicial proceedings. This included the judge, petit jurors, grand jurors, counsel, and witnesses. Absolute immunity was regarded as essential to each, if justice was to have the full and uninhibited cooperation of those participants whose role was and is absolutely vital to the working of the entire judicial process. As Justice White declared in Imbler,[72] "It is essential to the ends of justice that all persons participating in judicial proceedings . . . should enjoy freedom of speech in the discharge of their public duties or in pursuing their rights, without fear of consequences."
 
 
 153
 This is not to say that improper conduct in the courtroom or elsewhere by any participant could not then and cannot today be punished. The judge has always been subject to impeachment, prosecution, and disbarment as a lawyer. The prosecutor and defense counsel have always been subject to punishment for contempt, prosecution for any crime such as obstruction of justice, and disbarment.[73] Witnesses have always been subject to punishment for contempt, perjury, or possibly obstruction of justice. Criminal penalties likewise have been applied to petit jurors and grand jurors. No immunity protects these persons from criminal prosecution or professional discipline, if anyone should act contrary to law in the performance of his office.
 
 
 154
 But none of these participants, essential to the functioning of the judicial process, has ever been held to be subject to a civil suit by an allegedly aggrieved party because of anything said or done while functioning in the role of judge, juror, witness, or counsel.
 
 
 155
 The reasons for the historic common law absolute immunity of these essential participants is obvious on analysis, which will be developed in the following pages. What the majority of this court does in this decision is not just throw open one possibly errant prosecutor to civil liability, but to tear the whole seamless fabric of absolute immunity granted essential participants in the judicial process from time immemorial.
 
 
 156
 If we were to accept the majority's rationale here, the impact of the Bivens case and § 1983 on historic common law immunities would be devastating. Fortunately, that is not the way the Supreme Court has gone about its analysis. I can only deduce from it that the witness, particularly a public official as witness, should be accorded the same absolute immunity as the other participants.
 
 
 157
 It is well established that " § 1983 is to be read in harmony with general principles of tort immunities rather than in derogation of them."[74] Thus, in deciding which official functions should be absolutely protected from suit under § 1983, the Court has generally sought first to determine the status of the common law immunity with regard to that function, then the Court has considered whether the public policy behind the common law rule justifies the same immunity for "constitutional torts." In a number of instances, the Court has adopted the absolute immunity that had developed at common law: Tenney v. Brandhove[75] (legislators); Pierson v. Ray[76] (judges); Imbler v. Pachtman, supra (prosecutors). Even though these immunities had initially arisen only with regard to common law torts, the Court preserved them with regard to deprivations of constitutional rights as well. Where the common law had established a qualified immunity for the official, the Court has maintained that standard in the § 1983 actions as well: Pierson v. Ray, supra (policemen); Wood v. Strickland[77] (school board members). As in the cases of absolute immunity, the court entered into a fresh appraisal of the competing factors, including, as just mentioned, the nature of the new "constitutional tort." The fact that the results reached by the Court have generally[78] paralleled the judgments of the common law does not mean, of course, that the status of the common law immunity is dispositive, but surely does suggest that the common law, as a starting point of analysis, should not be "overruled" lightly.
 
 
 158
 The absolute immunity of the witness at common law is as firmly rooted in history and as widely accepted by the courts as is the absolute common law immunity that was accepted for legislators in Tenney, for judges in Pierson, and for prosecutors in Imbler. Immunities for various participants in the judicial process were already established by courts as early as the sixteenth century,[79] and in 1772 Lord Mansfield announced the comprehensive rule: "Neither party, witness, counsel, jury nor judge can be put to answer, civilly or criminally for words spoken in office."[80] Accepted as "practically (the) universal rule in this country,"[81] this rule of absolute immunity means that a witness in judicial proceedings cannot be held liable in civil damages for injury that ensues from any relevant testimony. Of particular significance is that this rule is also applied as a matter of federal common law,[82] which, the majority tells us,[83] is an important focus for the formulation of a federal immunity standard. Absolute witness immunity has been carried into the Restatement of Torts[84] and has been set out approvingly by the commentators as well.[85] It is notable that in Imbler itself Justice White wrote that the need to protect the judicial process at common law meant that absolute immunity "applied to suits against witnesses themselves for delivering false and defamatory testimony."[86]
 
 
 159
 Do the policies that underlie the common law immunity for a witness warrant the continued availability of absolute immunity in § 1983 or Bivens -type suits? The policy behind the common law reflects a balancing process. In the context of a defamation suit,[87] Judge Hastie expressed the rationale for absolute witness immunity as follows:[88]
 
 
 160
 This rule reflects the prevailing common law view that the public interest in freedom of expression by participants in judicial proceedings, uninhibited by any risk of resultant suits for defamation, outweighs the interest of the individual in the protection of his reputation from defamatory impairment in the judicial forum.
 
 
 161
 The reason for the public interest in the "freedom of expression" of a witness is that the judgment of the judicial process itself, the centerpiece of all judicial immunities, may well be based on the testimony of the witness and the witness, thus, should be fully encouraged to disclose pertinent information. "For a witness," Justice White states, "this means he must be permitted to testify without fear of being sued if his testimony is disbelieved."[89] Full disclosure may be impaired, in other words, if there can be "intimidation" deriving from "the possibility of civil liability."[90]
 
 
 162
 Set against the value of full freedom for the witness is, as Judge Hastie noted, the possible damage, e. g., to the reputation of others, that may ensue. This danger has its limits, however, because witnesses are, of course, "subject to the control of the trial judge and are subject to contempt citations for misbehavior in the exercise of the privilege and to prosecution for perjury if convicted of knowingly giving false testimony."[91] Thus, with a deterrent already available against perjury by a witness in the form of criminal sanctions, the common law regarded the additional deterrent of having to defend a civil damage suit as rendering "the risk of self-censorship . . . too great."[92]
 
 
 163
 In striking the balance in favor of absolute immunity, the common law meant in no way to derogate the duty of the witness to state the facts objectively. Of course, the witness has no discretion to commit perjury, but, to borrow from Learned Hand, it might be "impossible to know whether the claim (of perjury) is well founded until the case has been tried."[93] Such a possibility, Judge Hand concluded (in the context of prosecutorial immunity), could "dampen the ardor"[94] of even the person intending to perform truthfully and properly. The witness immunity at common law is apparently so thorough that it makes no exception for an action where the perjury seems, on the face of the complaint, to admit of no ambiguity, such as when a husband of twenty five years testifies, for example, that he has never been married. Even though it might be "monstrous to deny recovery"[95] in that case, the common law is so unwilling to expose the honest witness to any civil risk that it would not allow even that case to go to trial.
 
 
 164
 The policies underlying common law immunity for a witness justify the availability of absolute immunity for a witness sued in a § 1983 or Bivens -type action. As noted, the common law regarded absolute immunity for the witness as essential to the protection of the integrity of the judicial process. Similarly, each time the Supreme Court in a § 1983 suit has considered the immunities related to the judicial process, the Court has continued the absolute immunity of the common law for judges in Pierson and for prosecutors in Imbler. Indeed, the Imbler Court strongly suggested, both in the majority and separate opinions, that it would readily extend the full immunity to grand jurors[96] and defense counsel.[97] The Court's continued extension of absolute immunity to all the participants in the judicial process, which undeniably includes witnesses, represents a thorough acceptance of the common law policy that the provision of only qualified immunity might inhibit the full disclosure of relevant evidence and impair the judgment of the court. In each instance the common law policy has been assessed as a "compelling" enough justification for the absolute immunity also to be available for constitutional torts.
 
 
 165
 The majority gives no reason at all, and none appears to me, why a witness should be singled out for less than the full protection afforded all the other participants.[98] As for other participants, the possibility of civil liability for the witness undoubtedly can be said to provide some "chill" to the full expression of his testimony. Where "the triers of fact in criminal cases often would be denied relevant evidence,"[99] as a consequence of the provision of only qualified immunity, the judgment of the court can plainly be said to be impaired. The possibility of this "adverse effect upon the functioning of the criminal justice system"[100] has warranted absolute immunity for other participants in the judicial process and warrants absolute immunity for the witness too.
 
 
 166
 The witness should not be singled out for less protection than the other participants in the judicial process because, like those participants, he is also subject to other checks on the abuse of his power. Testimony may be excluded from court or tested under cross-examination and through jury scrutiny. The witness himself is subject to the supervision and discipline of the court and may even be indicted and convicted of perjury. Following the reasoning of the Imbler Court about prosecutorial immunity,[101] it is fair to say that the existence of those other checks undermines the argument that the imposition of civil liability is the only way to prevent a witness from inflicting constitutional injury through false testimony.
 
 
 167
 It is noteworthy that the only other court to consider the liability of a witness in a Bivens -type suit had no hesitation in awarding absolute immunity Brawer v. Horowitz.[102] Noting the need for "fearless" witnesses and the means, other than damage suits, for deterring perjury, Judge Aldisert, writing for a unanimous panel of the Third Circuit, concluded:[103]
 
 
 168
 The policy arguments supporting common-law witness immunity obtain equally to immunize a single witness from a Bivens -type action.
 
 
 169
 This is the holding, and it is good precedent here, despite the majority's unwillingness to accept it.[104] The majority's notation that the merits of Brawer were reached only by assuming arguendo that the witness was acting under color of law is beside the point, as Brawer's assumption of state action does not invalidate its documentation and reasoning.[105]
 
 
 170
 In addition to the common law policies discussed above and followed in Brawer, there are reasons why the absolute immunity should especially be preserved for the official as witness. Officials who are called as witnesses have duties in addition to the duty to tell the truth in their testimony. To the extent these additional duties are impaired by qualified immunity, that is all the more reason to assure them the full immunities afforded private citizens who have only their duties as witnesses.
 
 
 171
 Let us take the office of the prosecutor, for example. Suppose as a witness a prosecutor responds to the judge with very definitive but honest answers, but later uncovers evidence that puts into serious doubt the accuracy of his testimony. If he were only afforded qualified immunity, then this warning from Imbler becomes very appropriate: "The possibility of personal liability . . . could dampen the prosecutor's exercise of his duty to bring to the attention of the court or of proper officials all significant evidence suggestive of innocence or mitigation."[106]
 
 
 172
 Other officials are subject to similar duties. An FBI agent, for example, is supposed to reveal to the prosecutor mitigating evidence he unearths. Will the FBI agent be chilled in the exercise of this duty because he testified, albeit honestly, to the contrary, and fears a lawsuit for perjury as a witness, defensible only with a qualified immunity? Considerations such as these, left unaddressed by the majority, further tipped the balance towards absolute immunity in Imbler and, as shown, counsel us to provide absolute immunity to officials in their capacity as witnesses.
 
 
 173
 In sum, the rejection in toto by the majority of an absolute immunity for a witness in a Bivens -type suit amounts to a tearing of the whole seamless fabric of absolute immunity granted the other participants in the judicial process judges, prosecutors, defense counsel and jurors. In doing so, the majority clearly fails to engage in a full and reasoned analysis of the common law immunity, as Imbler requires and exemplifies. The majority's result not only clashes with the one other Circuit holding on witness immunity but, most significantly, undercuts a compelling interest that is at the heart of the judicial process, that is, that the integrity of its fact-finding function is best served by providing absolute freedom from civil suit to its participants so as to encourage unintimidated disclosure and expression.
 
 
 174
 The majority also argues the point that whatever the value of the common law immunity of the witness these policies are "tangential, and essentially irrelevant" to this case because the prosecutor here was not an "ordinary witness." In attempting to carve out an exception to the absolute immunity of the witness the majority relies, as we shall see, upon a particular reading of immunity doctrine that was clearly rejected in Imbler. Noting that Goodwin did not testify "in the usual sense at a trial or even before grand jurors," the majority also recites that it was the judge who asked the question and that the opportunity for cross-examination was denied.[107] These circumstances demonstrate for the majority, as it said earlier,[108] how the statement was thus "insulat(ed)" from examination and appraisal and how, therefore, it warrants only qualified immunity. As I understand this rationale, it goes more fully as follows: one justification for absolute witness immunity is that possible perjury by a witness will be subjected to the "rough-and-tumble" of the trial process cross-examination, jury scrutiny, and the presentation of conflicting evidence, so that when these corrective elements are lacking, as when cross-examination is foreclosed, the witness is not really an "ordinary" witness for purposes of absolute immunity and may justifiably be accorded only qualified immunity.
 
 
 175
 In Imbler, however, the majority expressly rejected the argument that absolute immunity for a prosecutor should turn on whether his possible constitutional violation in particular could be corrected through the trial process.[109] As explained in more detail earlier,[110] Imbler meant for the prosecutor to have absolute immunity even if his constitutional violation had involved the complete suppression of exculpatory evidence, a decision insulated from scrutiny at trial. Similarly with a witness, the provision of absolute immunity should not turn on whether the testimony could be tested for accuracy through cross-examination or whether the substance of the testimony itself amounted to a total suppression of the information sought. Absolute immunity for a witness is meant to ensure an unintimidated opportunity to contribute to the fact-finding of the judicial process; its availability should not depend on how, in a particular case, that opportunity was utilized.[111]
 
 
 176
 Such an ad hoc rule, to be applied retroactively, as the majority enunciates here, would be totally devastating to any realistic protection by "absolute" (?) immunity.
 
 
 177
 The majority's other argument for finding absolute witness immunity inapplicable is that "(t)he statement assailed here was prompted by, and directly incidental to, appellant's status as a prosecutor managing and administering an investigation."[112] Since the statement was related to his status as an investigator, as the majority sees it, he then is entitled to only a qualified immunity.[113] Even accepting the majority's characterization of Goodwin's underlying status as an "investigator," it appears that the majority's analysis simply begs the question of witness immunity. If a witness is only entitled to the immunity of his underlying status, then the majority is really rejecting absolute witness immunity entirely as a special immunity that attaches to a certain class of participants in the judicial process. A police officer testifying about a search and seizure, for example, may only have a qualified immunity, as a police officer, but that does not mean he is not entitled to absolute immunity, as a witness. If the underlying status is dispositive of the degree of witness immunity, qualified or absolute, then the majority is really saying that there should be no special witness immunity at all.
 
 
 178
 Thus, its view that Goodwin in this particular case should not have absolute witness immunity is based upon its general position that no witness, qua witness, should be afforded absolute immunity where a "constitutional tort" is involved. And THAT is an idea whose time has not hitherto come in any court. I am not ready for it here.
 
 D. Absolute Counsel Immunity
 
 179
 Still another reason that the majority advances for considering witness immunity inapt is that, for all practical purposes, Goodwin could readily have given the same answer from the counsel table, "as an officer of the court,"[114] as he gave from the witness stand. There should be no difference, the majority contends, in the scope of immunity conferred for the same statement whether the prosecutor is on the witness stand or at the counsel table. With that last general statement I am in agreement, for the prosecutor from the counsel table, as "an officer of the court," is under no less of an obligation to tell the truth than a prosecutor on the witness stand. But the problem with the majority's conclusion that the witness here, therefore, should not have absolute immunity is that there is also an established absolute immunity for all relevant statements made by counsel in court. In other words, if Goodwin had made the same statement from the counsel table rather than from the witness stand, he would have absolute immunity as counsel in a judicial proceeding, even apart from whatever protection is available under Imbler. Goodwin did make the statement in the momentary capacity of a witness, so this dissent has taken up that immunity in some detail, but if the majority wishes to contend that the witness immunity here should be the equivalent here of counsel immunity, I am willing to contend as well that absolute counsel immunity would extend to Goodwin's statement from the table, if that had happened instead.
 
 
 180
 As with judges and witnesses, the common law afforded absolute immunity to action taken by counsel in judicial proceedings. Indeed, as Prosser explains,[115] the "privilege covers anything that may be said in relation to the matter at issue, whether it be in the pleadings, in affidavits, or in open court." In common with the other immunities, absolute counsel immunity was and is based on the policy of protecting the judicial process. And with the other immunities, it is equally as well settled.[116] In the context of a § 1983 or Bivens -type suit, this absolute immunity at common law should carry over, even as against constitutional torts, precisely because of the compelling interest, as illustrated by the common law, in protecting the judicial process. I have explained these interests and policies in more detail in my argument earlier that the absolute witness immunity of common law should also be available in § 1983 and Bivens -type suits,[117] and need not repeat them here. Suffice it to say that Goodwin would surely have been acting as counsel in the case if the judge had asked him a question during a grand jury proceeding, even apart, of course, from whether he was acting as a prosecutor in the Imbler sense. At common law, as noted, all relevant statements of counsel, be they termed advocacy or investigation, within the confines of the courtroom process were entitled to absolute protection. If counsel immunity is to be carried over for constitutional torts, as would be expected under the unwavering protection afforded the judicial process by the Supreme Court, then there is simply no basis for assuming that Goodwin's statement, if made from the counsel table instead, would be entitled to only qualified immunity.[118]III. REVIEWABILITY OF THE WITNESS IMMUNITY ISSUE
 
 
 181
 While the above concludes my dissent, Judge Robinson and I are of the view that the question of absolute witness immunity is before us for decision at this point under the "collateral order" exception to the final judgment rule of 28 U.S.C. § 1291. Although Judge McGowan's opinion does set out the basic reasoning for why the collateral order doctrine "may be thought to be present here," it is necessary for us in the majority on this point to amplify this reasoning in somewhat more detail, not only to provide greater dimension to the summary description presently available but also to respond to the reservations of Judge McGowan in dissent on this point.
 
 
 182
 As Judge McGowan's opinion explains in more detail,[119] the District Court in this case certified the question of absolute prosecutorial immunity for interlocutory appeal under 28 U.S.C. § 1292(b) but did not so certify the question of absolute witness immunity. For reasons of his own,[120] Judge McGowan believes that review of the question of absolute witness immunity should be declined at this point and should instead await appeal from any final judgment in this action.
 
 
 183
 In the recent case of Abney v. United States,[121] the Court was asked to review the pretrial dismissal of petitioners' claims that their retrial would violate the Double Jeopardy Clause. The Court accepted review of the pretrial dismissal as it amounted to a "final decision" on the jeopardy claims under the practical construction that had been given that term. See Cohen v. Beneficial Industrial Loan Corp.[122] The rights conferred by the Double Jeopardy Clause, the Chief Justice stated for a unanimous Court, would be "significantly undermined" if review of their claims were postponed until after conviction and sentence. "Obviously," the Chief Justice noted,[123] much protection would be lost with postponed review:
 
 
 184
 (E)ven if the accused is acquitted, or, if convicted has his conviction ultimately reversed on double jeopardy grounds, he has still been forced to endure a trial that the Double Jeopardy Clause was designed to prohibit (footnote omitted) (emphasis added).
 
 
 185
 Because the double jeopardy claims met the other requirements of the "collateral order" rule, viz., that the pretrial dismissal had "fully disposed" of the question, and that the question was "collateral," or separate from the principal issue of the trial (guilt or innocence), the Court considered the pretrial orders as "final decisions" and proceeded to review them.
 
 
 186
 The analogy between Abney and the instant case is close and striking. As with the Double Jeopardy Clause, the purpose behind absolute immunity is as much to protect the relevant persons from a trial on their actions as it is to protect them from the outcome of trial. In the classic statement of Judge Learned Hand:[124]
 
 
 187
 The justification for (absolute immunity) is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.
 
 
 188
 To wait until after the trial for the appellate review of claims of absolute immunity subverts a basic rationale of the doctrine, as Judge Hand has set it out, that is, to prevent the chilling of the free exercise of discretion by not subjecting an official in the protected capacity to a trial for damages on his action.
 
 
 189
 Judge McGowan responds that interlocutory review nevertheless is inappropriate on this absolute immunity question because the question is preserved in the record and will be available for review upon appeal of any final judgment in the action. This is literally true, of course, but for that matter, so would the double jeopardy claim in Abney have been preserved in the record for review from conviction and sentence. Instead, however, the Abney Court inquired into whether the relevant rights that were the subject of the pretrial order would be "significantly undermined" if appellate review had to await final action in the case. Applying this inquiry here, it is clear and Judge McGowan does not contest the point that the full protection of absolute immunity would be irreparably lost if review had to await final judgment.[125] To paraphrase Abney, even if the defendant here is held not liable in damages, or, if held liable, has his liability ultimately reversed on absolute witness immunity grounds, "he has still been forced to endure a trial that the (doctrine of absolute immunity) was designed to prohibit."
 
 
 190
 As his second objection to interlocutory review of absolute witness immunity, Judge McGowan contends that because the District Court declined to certify this question under 28 U.S.C. § 1292(b) the collateral order doctrine should not be invoked "as a vehicle for appellate revision of the essential determination committed by Congress to the District Court."[126] I would agree with Judge McGowan that in the Interlocutory Appeals Act of 1958 Congress meant to make unreviewable the decisions of the District Court about whether to certify a question for interlocutory appeal.[127] However, I submit that a refusal to certify an order for appeal under § 1292(b) has not necessarily been read, and should not necessarily be read as forever foreclosing that order from interlocutory appeal by another route.
 
 
 191
 Imagine, for example, if the petitioners in Abney had sought (as they did not) certification of their double jeopardy claims from the trial court and had been denied it. I agree that there could be no review of the denial of certification, e. g., for abuse of discretion, but I cannot agree that on that account there could be no interlocutory review through another means of the double jeopardy claims. Indeed, the authority cited by Judge McGowan takes the view that the denial of § 1292(b) certification should not be read so harshly. Speaking of the developing doctrine of "supervisory" mandamus, Professor Moore notes: "If a § 1292(b) certificate is sought and denied, mandamus will then lie in an appropriate case, not to compel issuance of the certificate, but to review the order for which the certificate was sought."[128] The Supreme Court has instructed us that interlocutory review by "supervisory" mandamus of nonfinal orders may be "necessary to proper judicial administration in the federal system."[129] When the circumstances require that "supervisory" mandamus be exercised, mandamus of the underlying order should not be barred solely because the trial court refused to certify it. For, as another commentator suggested,
 
 
 192
 (Section) 1292(b) does not obviate the need for advisory mandamus. . . . (C) ertification is limited by the discretion of the district judge; while enlightened judges may well see the necessity of rapid determination of a difficult problem, the policies favoring mandamus should not be bent to the will of individual district court judges.[130]
 
 
 193
 Similarly, when the policies behind the collateral order doctrine call for the interlocutory appeal of a "final" pretrial order, those policies favoring immediate review, as in the Abney situation, for example, should not be bent to the will of individual district court judges. Since the discretion of the trial judge whether to certify is itself unreviewable, the value of immediate review in the "small class" of cases where it is warranted under the collateral order doctrine could be irretrievably lost if Judge McGowan's view, that denial of certification per se bars interlocutory review, were to prevail.CONCLUSION
 
 
 194
 In summary, the errors and misconceptions of the majority opinion are:
 
 
 195
 1. The underlying principles of Imbler v. Pachtman in granting absolute immunity to the prosecutor there must be applied to Goodwin here. If this is done, the Supreme Court's principles compel the same absolute immunity for this prosecutor. Efforts to distinguish Imbler are based upon factors that are immaterial under the very terms of Imbler and are inappropriate for the doctrine of quasi-judicial immunity.
 
 
 196
 2. The majority has engaged in a particularistic inquiry here, as to the duties at a single moment of this particular prosecutor in these particular circumstances. All the Supreme Court decisions on immunity show the Court applying a balancing test, with reference to common law precedent, on broad categories of public officials to determine the immunity appropriate.
 
 
 197
 3. The majority has sought to draw a line between the prosecutor as an advocate before the court or with the grand jury in its "deliberative" function, and the prosecutor with the grand jury in its "investigative" function. The prosecutor's duties with the grand jury cannot be so divided, legally or practically, and the majority has not been so bold as to claim that the prosecutor is deprived of his absolute immunity at all times when he steps from the courtroom into the grand jury room.
 
 
 198
 4. Even apart from how his relation to the grand jury is characterized, it is undeniable that Goodwin's statement was made as a sworn witness in a judicial proceeding, a function which itself is a source of absolute immunity.
 
 
 199
 In summary, these are the unfortunate consequences which will flow from the majority's decision:
 
 
 200
 1. The time-honored absolute quasi-judicial immunity of the prosecutor (and other counsel) in every courtroom situation will be replaced by a qualified immunity in every situation, in or out of the courtroom. For under the particularistic analysis of the majority opinion, it will always be possible to contend that what the lawyer did under those particular circumstances was entitled only to a qualified immunity. Thus, counsel will be effectively subjected to harassing suits, as Goodwin has been here, until the highest court available finally determines whether absolute or qualified immunity applies. This illustrates the vast practical difference between absolute and qualified immunity, pointed out by Mr. Justice Powell in Imbler.
 
 
 201
 2. The number of instances in which counsel, especially prosecutors, are called to the witness stand will take a quantum leap. Now so rare an occurrence that all our research has not been able to find an appellate case similar to Goodwin's, in the future defense lawyers will be unable to resist the temptation to call the prosecutor to the stand, to force him to hedge or qualify the government position on some important point, at all times with the threat of a possible subsequent civil suit hanging over him if he does not do so. Trial judges can curb this only at the risk of giving the defense another arguable point on appeal.
 
 
 202
 3. All witness immunity as such is struck down. Now, under the majority opinion, all immunity relating to testimony will be determined by the witness' function (not even his regular duties or position), considered in the particular circumstances of the individual case. This brings into contemplation a nightmare of inconsistent variable rules and applications.
 
 
 203
 4. All of the above represents a deadly blow at nearly all the common-law recognized quasi-judicial absolute immunities prosecutor, counsel and witness. Jurors, and then judges, will doubtless be next.
 
 
 204
 For all these reasons, and for those more fully set out in my opinion earlier, I must respectfully dissent.
 
 
 
 [1]
 The contempt orders were later vacated on grounds unrelated to this case. See Beverly v. United States, 468 F.2d 732 (5th Cir. 1972). The court's opinion in Beverly noted that, of the 23 VVAW members or associates subpoenaed to appear before the grand jury in Tallahassee on the morning of July 10, 1972, the first day of the Democratic National Convention in Miami Beach, four were dismissed two days later and all but two of the remainder were dismissed on July 13, the last day of the Convention. Most of those subpoenaed were not called upon to give testimony. Since the subpoenas effectively prevented their utilization of the parade permits they had obtained from the Miami authorities for anti-war demonstrations during the Convention, the contention was made in Beverly, albeit disallowed, that the grand jury process, either in purpose or effect, was invalid as denying First Amendment rights. The indictments returned on July 13 against six of those subpoenaed were based on the testimony of other witnesses
 
 
 [2]
 The complaint in this action states only that six appellees were "indicted for conspiracy to cross state lines and riot at the Republican National Convention," held in Miami from August 21 to August 24, 1972. Further detail about the criminal charges is not available in the record, but may be obtained from the opinion in Beverly, id. at 737 n. 9
 
 
 [3]
 In addition to appellant, the complaint named as defendants two regular federal prosecutors from the Northern District of Florida, and a special agent of the FBI. The complaint was dismissed as to the latter three defendants for lack of venue and personal jurisdiction. In Briggs v. Goodwin (Stafford, et al.) 186 U.S.App.D.C. ---, 569 F.2d 1, decided today, the District Court is reversed and the complaint reinstated as to those defendants
 
 
 [4]
 The District Court's ruling did not reach the question of whether appellees' request for equitable relief was barred by the official immunity doctrine. It is uncertain at best whether consideration of this issue falls within the scope of our jurisdiction on this interlocutory appeal under 28 U.S.C. § 1292(b) (1970). We believe it to be fairly clear that official immunity ordinarily bears only on the availability of a damages remedy, rather than prospective equitable relief, see, e. g., Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Dombrowski v. Pfister, 380 U.S. 479, 88 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943), and in any event, our resolution of the immunity issue in the context of the request for monetary relief would likely preclude refusal to award equitable relief on the basis of official immunity. However, we believe it the better practice to leave this issue to be addressed in the first instance in the District Court. The District Court will be able simultaneously to consider a range of other possible objections to such relief, based upon questions of constitutionality, justiciability, the scope of the court's power, the availability of that relief against the named defendants, and so forth
 
 
 [5]
 Briggs v. Goodwin, 384 F.Supp. 1228, 1230 (D.D.C.1974):
 Where, as in this case, a prosecutor is alleged to have committed perjury, an activity beyond the scope of his authority, in clear violation of law and far removed from the discretionary areas of the judicial process traditionally protected by the quasi-judicial immunity doctrine, the Court concludes that this doctrine is not applicable.
 
 
 [6]
 See, e. g., Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949) (L. Hand., C. J.), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950):
 The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him.
 Accord, Note, Quasi-Judicial Immunity: Its Scope and Limitations in Section 1983 Actions, 1976 Duke L.J. 95, 110-11.
 
 
 [7]
 Traditionally, courts have refused to confer absolute immunity upon behavior which, though clearly within the scope of an official's authority, was "ministerial" rather than "discretionary" in character. See, e. g., Johnson v. Alldredge, 488 F.2d 820, 824-25 & n. 2 (3d Cir. 1973), cert. denied, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974); Whirl v. Kern, 407 F.2d 781, 790-92 (5th Cir. 1968), cert. denied, 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969), modified, Bryan v. Jones, 530 F.2d 1210 (5th Cir. 1976) (en banc ; six opinions); Cooper v. O'Connor, 69 App.D.C. 100, 102, 99 F.2d 135, 137 & n. 2, cert. denied, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414 (1938). As Prof. Jaffe has perceptively observed, the "ministerial-discretionary" dichotomy may well be "a way of stating rather than arriving at the result." Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv.L.Rev. 209, 218 (1963). Certainly acknowledgement of the abstract distinction does not by itself resolve the difficult and varied immunity questions which may be presented by the infinite permutations of a government's interaction with its citizens. Some courts, presumably motivated by a desire for technical accuracy, have denied "immunity" altogether for so-called ministerial acts. These courts, respecting the conventions of pleading terminology, have apparently felt that the term "immunity" suggests immediate success on a motion to dismiss, and therefore have not used the phrase "qualified immunity" to denote the availability of a "good faith, reasonable belief" affirmative defense for government officials charged with constitutional torts. See, e. g., Fidtler v. Rundle, 497 F.2d 794, 800-01 (3d Cir. 1974); Bivens v. Six Unknown Named Agents, 456 F.2d 1339, 1342-43, 1345-48 (2d Cir. 1972) (on remand). Recent Supreme Court decisions have generally avoided the "ministerial-discretionary" language in favor of analysis focusing directly on the need for differing levels of protection in connection with different official functions, the performance of which has given rise to damage claims. See, e. g., Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); and Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). We view this methodological shift as a salutary development in the case law. However, we note in passing that under a more traditional approach, appellant's act of answering a single inquiry from the court, an inquiry which plainly called for a simple affirmative or negative response, might well have been classified as a ministerial, rather than a discretionary, act, and thus accorded at best a qualified immunity
 
 
 [8]
 Unlike the California prosecutor in Imbler, appellant in the present case is a federal employee. Therefore, this suit has been brought under a Bivens theory, rather than as a § 1983 action. We are convinced that this dissimilarity does not diminish, for our purposes, the precedential value of Imbler and other cases involving § 1983 suits. In explaining this statement we begin by observing that where officers have been accused of common law torts, courts have turned to federal law for the delineation of appropriate immunities. See Wheeldin v. Wheeler, 373 U.S. 647, 652, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963), and Norton v. McShane, 332 F.2d 855, 860 n. 6 (5th Cir. 1964). Moreover, the features of immunities developed under federal common law need not duplicate the characteristics of corresponding immunities as they have evolved in the decisional law of the various states. See, e. g., Fidtler v. Rundle, 497 F.2d 794, 799 (3d Cir. 1974). Thus, where common law tort allegations are concerned, state and federal officers may conceivably be accorded different measures of immunity for similar wrongs. However, § 1983 is a federal statute, creating a federal cause of action for constitutional violations committed under color of state law. The immunities enjoyed by state officials sued under § 1983 are governed by federal law. See, e. g., Fidtler, supra, at 799-800; Comment, Civil Liability of Subordinate State Officials Under the Civil Rights Act and the Doctrine of Official Immunity, 44 Calif.L.Rev. 887 (1956); Note, The Doctrine of Official Immunity Under the Civil Rights Acts, 68 Harv.L.Rev. 1229 (1955). In ascertaining what this federal immunity standard ought to be in a particular case, courts are often guided by the general common law tradition, but they are certainly under no compulsion to adhere to the vagaries of peculiar state common law rules, or even to a clear common law consensus position, assuming one exists. See, e. g., Scheuer, supra
 In the five years since the Supreme Court announced its decision in Bivens, supra, the lower federal courts have produced some conflicting interpretations of the holding in that case. Numerous jurisdictions have apparently concluded that Bivens established a cause of action for damages arising from the violation of any constitutional right by a federal official. See, e. g., Paton v. La Prade, 524 F.2d 862 (3d Cir. 1975); Yiamouyiannis v. Chemical Abstracts Service, 521 F.2d 1392 (6th Cir. 1975); States Marine Lines, Inc. v. Shultz, 498 F.2d 1146 (4th Cir. 1974); United States ex rel. Moore v. Koelzer, 457 F.2d 892 (3d Cir. 1972); Gardels v. Murphy, 377 F.Supp. 1389 (N.D.Ill.1974), and Butler v. United States, 365 F.Supp. 1035 (D.Haw.1973). Other courts have read the leading case more narrowly, restricting its sway to Fourth Amendment transgressions like that actually treated by the Supreme Court in Bivens. See, e. g., Moore v. Schlesinger, 384 F.Supp. 163, 165 (D.Colo.1974), aff'd by unpub. opinion (10th Cir. Nov. 21, 1975), cert. denied, 425 U.S. 958, 96 S.Ct. 1738, 48 L.Ed.2d 203 (1976); and Davidson v. Kane, 337 F.Supp. 922, 924 (E.D.Va.1972). Several tribunals have noted the issue, but reserved decision. See, e. g., Holodnak v. Avco Corp., Avco-Lycoming Div., Stratford, Conn., 514 F.2d 285, 292 (2d Cir.), cert. denied, 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975), and Wahba v. New York University, 492 F.2d 96, 103-04 (2d Cir.), cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974).
 In this case, the District Court may eventually have to resolve the question of whether appellees' complaint states a valid cause of action within the contemplation of Bivens. We need not now consider whether Bivens authorizes constitutional tort suits against federal officers to the same extent that § 1983 allows similar litigation against state functionaries. We declare only that, assuming the rule of Bivens comprehends a damage action for a particular constitutional infringement by a federal officer, the federally-determined immunity applicable in such a case should be no different from the federally-determined immunity available in a § 1983 suit against a state official. Prior decisions in this circuit and elsewhere provide abundant support for our comments in this regard. See, e. g., Economou v. United States Dept. of Agriculture, 535 F.2d 688, 695 n. 7 (2d Cir. 1976), cert. granted, 429 U.S. 1089, 97 S.Ct. 1097, 51 L.Ed.2d 534 (1977); Mark v. Groff, 521 F.2d 1376, 1380 (9th Cir. 1975), and Apton, supra, relying on the Supreme Court's holding in Scheuer, which was a § 1983 suit, even though Apton involved federal officials sued under the Fourth and Fifth Amendments.
 
 
 [9]
 An isolated and clearly incorrect footnote in S & S Logging Co. v. Barker, 366 F.2d 617, 620 n. 2 (9th Cir. 1966), constitutes the only other authority offered by appellant which arguably rejects the notion that a prosecutor in his investigative role should be accorded a lesser measure of immunity than he merits when functioning as an advocate. S & S Logging was a private Clayton Act suit in which Federal Forest Service officials were held absolutely immune from charges that they had conspired to monopolize and control the sale of government-owned timber. In trying to explain the earlier decision of a different Ninth Circuit panel in Robichaud, supra, Judge Pope's opinion in S & S Logging erroneously relied on the fact that the Robichaud complaint rested upon § 1983. This view that the qualified immunity announced in Robichaud was traceable to the statutory underpinning of appellant's claim rather than to the investigatory nature of appellees' conduct stemmed in part from an overbroad reading of Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). Barr had established that executive officials enjoyed absolute immunity from common law damage suits based on discretionary actions within the scope of their authority. Barr dealt neither with the quasi-judicial immunity of prosecutors nor with the level of immunity generally appropriate in constitutional tort suits under § 1983. Nevertheless, the S & S Logging court for some reason felt that Barr precluded the grant of different types of immunity for different types of prosecutorial conduct attacked under § 1983. The idea that the qualified immunity in Robichaud could be defended solely by reference to the § 1983 context of that case is particularly surprising in light of the court's actual holding in S & S Logging, i. e., finding absolute immunity for executive officials in a Clayton Act suit, even while admitting that most previous applications of such immunity had occurred in the common law arena. See 366 F.2d at 622
 
 
 [10]
 Some further comments are appropriate in connection with two of the precedents flagged by appellant. In a frequently-quoted opinion by Learned Hand, the Second Circuit in Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950), expounded the standard justification for absolute prosecutorial immunity. The difficulty with Gregoire lies in its facts. Appellant sued two successive Attorneys General of the United States, two successive Directors of the Enemy Alien Control Unit of the Department of Justice, and the District Director of Immigration at Ellis Island. Appellant alleged that he had been kept in custody as a German enemy alien for nearly four years after the Enemy Alien Hearing Board had ruled that he was a Frenchman. No prosecutorial advocacy or quasi-judicial activity was involved. Of course, the dispute in Gregoire arose long before Bivens, supra, and therefore had to be litigated as a common law tort action, since appellees were federal officials. Without criticizing any of the reasoning employed by Judge Hand, we suggest that, were the case to arise today, appellees' conduct might well be deemed investigative or administrative, and thus accorded only a qualified immunity in a Bivens -type suit
 Duba v. McIntyre, 501 F.2d 590 (8th Cir. 1974), cert. denied, 424 U.S. 975, 96 S.Ct. 1480, 47 L.Ed.2d 745 (1976), presents a different problem. On September 11, 1970, appellant pled guilty to a charge of "unlawfully permitting some of his hogs to run at large upon the streets of the City of Friend, Nebraska." He was released on condition that he pay a $55 fine within one week. When the fine remained unpaid on September 24, the city attorney caused the local Justice of the Peace to issue a warrant for appellant's arrest. As recounted by the Eighth Circuit, appellant was "arrested and detained for about one hour, and 110 of his hogs were attached, loaded, and removed to an auction barn in York, Nebraska, where they were sold the following day without bond, inventory, or advertisement." 501 F.2d at 591. The appellate court recognized that prosecutors are cloaked with absolute immunity only when they act "within the scope of their proper prosecutorial capacity, rather than in an investigatory capacity." Id. at 592. However, the per curiam opinion never focused directly on the behavior of the city attorney. Rather, resolution of the immunity issue with respect to the Justice of the Peace was apparently considered dispositive of the prosecutor's immunity claim as well. In proceeding on this assumption, the court adhered strictly to its description of prosecutorial immunity as a "derivative form of immunity," springing from the absolute immunity enjoyed by judges under Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872). Because issuance of the arrest warrant was clearly within his general powers under state law, the Justice of the Peace in Duba was found absolutely immune from civil suit. The prosecutor's immunity for his conduct in connection with the arrest and execution sale then followed automatically. This approach appears faulty. While the court accurately identified the origins of prosecutorial immunity, it incorrectly concluded that the historical background necessitated identical results for judge and prosecutor in any given case. Without expressing any opinion on the proper characterization of the city attorney's behavior in Duba, we simply register our conviction that prosecutorial conduct must be evaluated independently on the facts of each case to determine the measure of immunity which that conduct deserves.
 
 
 [11]
 For example, in Apton, supra, Department of Justice officials, including the Attorney General, were granted only a qualified immunity in connection with their policy-making and supervisory participation in the arrest and detention of large numbers of individuals during the "May Day Demonstrations" of 1971. In Hampton, supra, the Illinois State's Attorney and one of his assistants were charged with having planned and executed a violent raid on a Chicago apartment, during which raid police gunfire killed two members of the Black Panther Party and wounded four others. In Robichaud, supra, appellant claimed that county prosecutors had employed unconstitutional coercive methods to obtain a confession. Likewise, in Dodd, supra, appellant, a prisoner in county jail, alleged that local prosecutors had sanctioned the use of threats, assaults, and other punitive measures in an effort to elicit false testimony against a criminal defendant then on trial
 
 
 [12]
 That statute, in pertinent part, reads as follows:
 When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order . . ..
 
 
 [13]
 See Note, Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b), 88 Harv.L.Rev. 607, 628-29 (1975) and Johnson v. Alldredge, 488 F.2d 820, 822-23 (3d Cir. 1973), cert. denied, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974)
 
 
 [14]
 The writer of this opinion, although prepared to deal with the merits of the witness immunity question, does not subscribe to the view that that question is before us. At issue in Cohen was the applicability in a federal stockholders' derivative suit of a state statute requiring the giving of security for costs and attorney's fees before such a suit could proceed. Referring to the District Court's resolution of the matter, the Supreme Court stressed that the disposition "will not be merged in final judgment. When that time comes, it will be too late effectively to review the present order and the rights conferred by the statute, if it is applicable, will have been lost, probably irreparably." 337 U.S. at 546, 69 S.Ct. at 1225. By contrast, in the case before us, it is indisputable that the witness immunity question is preserved in the record and will be available for review upon appeal of any final judgment in the action
 Moreover, as Professor Moore points out, the collateral order doctrine "emerged at a time when the final judgment rule was inflexible. Much has happened since. The Interlocutory Appeals Act of 1958 made potentially appealable very nearly all orders that present serious, undecided questions . . .." 9 Moore's Federal Practice P 110.10, at 135-36 (2d ed. 1975). Where, as here, that Act was invoked unsuccessfully, the collateral order doctrine was not intended to be employed as a vehicle for appellate revision of the essential determination committed by Congress to the District Court.
 
 
 [15]
 The only case which the dissent is able to cite is Brawer v. Horowitz, 535 F.2d 830 (3rd Cir. 1976), which did not even address the issue of the appropriate standard of witness immunity as a matter of federal common law. Rather, the court in Brawer simply determined that witness immunity should be applied in an action alleging "constitutional defamation," id. at 837, as opposed to the common law tort of defamation. In its brief discussion of the witness immunity issue in that case, the court failed even to recognize that, having decided that witness immunity was applicable to a Bivens -type action, it was free to construct a rule of immunity under federal common law different from that which it thought would be applied as a matter of state common law
 
 
 *
 1 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)
 
 
 [2]
 At --- of 186 U.S.App.D.C., at 21 of 569 F.2d
 
 
 [3]
 Ibid
 
 
 [4]
 Imbler, supra at 430-31 and n. 33, 96 S.Ct. 984
 
 
 [5]
 At ---, --- of 186 U.S.App.D.C., at 19, 21 of 569 F.2d
 
 
 [6]
 Imbler, supra at 430, 96 S.Ct. at 995
 
 
 [7]
 Id. at 431 n. 33, 96 S.Ct. at 995. (Emphasis added.)
 
 
 [8]
 Ibid. (Emphasis added.)
 
 
 [9]
 The Court's holding was thus explicitly delineated:
 We have no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate. We hold that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983.
 Imbler, supra at 430-31, 96 S.Ct. at 995. (Emphasis added.)
 
 
 [10]
 I cannot understand the majority's interjection of the thought: "Lest his stress on the advocacy function suggest that the Court was contemplating a mechanical immunity test based solely upon whether alleged prosecutorial misconduct occurred in court during the course of a trial, Justice Powell added a few words of elaboration in the margin." At --- of 186 U.S.App.D.C., at 19 of 569 F.2d. The few words are the Court's footnote 33. If the reader here will go back to --- of --- U.S.App.D.C., at 19 of 569 F.2d, and read the Supreme Court's language again, he will find that every reference to prosecutorial activity which is deemed within absolute immunity, is to activity outside the courtroom
 There is no reference to prosecutorial activity inside the courtroom which is deemed outside the advocate's role and thus outside absolute immunity. If Justice Powell, writing for the Court, had wanted to make the point my colleagues try to make, surely he would have given at least one example of prosecutorial activity inside the courtroom which the Court considered might be outside the advocate's role and thus not entitled to absolute immunity. But he did not because he had in mind no such theory, because he was making the point, and this only, that the prosecutor's advocacy role properly embraced activity both inside and outside the courtroom; there was absolutely no inference that in his activity inside the courtroom he could be characterized as "an administrator or investigative officer."
 Thus, from note 33 alone of the Supreme Court's opinion we might draw a conclusion directly contrary to that of the majority, a conclusion fatal to its attempt to label Goodwin's reply or testimony as "an act of investigation" devoid of any character of either advocacy or witness.
 The majority's reading of note 33, that it implies that some actions of a prosecutor during judicial proceedings are nonetheless outside absolute immunity, is further undercut by the Imbler Court's disposition of the separate view that Justice White advanced. According to Justice White, absolute immunity was justified for charges of use by a prosecutor of perjured testimony but not for charges of suppression by a prosecutor of exculpatory information. In specifically disagreeing with Justice White's view, the Imbler majority rejected this opportunity to acknowledge that particular courtroom conduct by a prosecutor might be accorded only qualified immunity, contending, inter alia, that, "the distinction is not susceptible of practical application." Imbler, supra at 431 n. 34, 96 S.Ct. at 995. This rejection is the rejection of the theory relied on by the majority (p. --- of 186 U.S.App.D.C., at 25 of 569 F.2d) that absolute immunity should be denied prosecutor or witness where his conduct is such that its validity cannot be tested under the adversary process of the courtroom.
 
 
 [11]
 Imbler, supra at 431 n. 33, 96 S.Ct. at 995. The majority contends, to the contrary, that at the time of the alleged perjury Goodwin and the grand jury were not engaged in "the initiation of a prosecution," ibid. According to the majority, the grand jury here was not functioning in its "familiar guise as a deliberative body deciding whether to return indictments for specific crimes on the basis of evidence gathered and presented by a public prosecutor." At --- of 186 U.S.App.D.C., at 24 of 569 F.2d. If that was so, how does the majority begin to explain the fact that on the same day as Goodwin's alleged perjury, 13 July 1972, the grand jury returned indictments against six of the appellees, charging them "with a variety of crimes centering around an alleged conspiracy to unlawfully disrupt the 1972 Republican National Convention"? At --- of 186 U.S.App.D.C., at 14 of 569 F.2d. The more logical inference to draw from the fact that Goodwin's alleged perjury took place on the same day as the return of the indictments is that Goodwin at that time was engaged in "the initiation of a prosecution."
 
 
 [12]
 Imbler, supra at 431 n. 33, 96 S.Ct. 984
 
 
 [13]
 Imbler, supra at 431, quoted in note 9, 96 S.Ct. 984, supra
 
 
 [14]
 Imbler, supra at 430, 96 S.Ct. at 995
 
 
 [15]
 The majority opinion (pp. --- - --- of 186 U.S.App.D.C., p. 25 of 569 F.2d) explains the procedural situation. Both prosecutorial and witness immunity were raised and briefed below. See also Part III, infra
 
 
 [16]
 We are in accord in rejecting the rationale of the trial court, that the action of responding to the court's question was not within the scope of his duty. At --- - --- of 186 U.S.App.D.C., at 15-16 of 569 F.2d. However, the opinion for the majority describes an alternative ground for the decision not to confer absolute immunity in this case, namely, that Goodwin's answer to the judge's question can be considered a nondiscretionary action. See at --- - --- of 186 U.S.App.D.C., n. 6, at 15-16 of 569 F.2d. Although it is unclear whether my colleagues are adopting this contention as a basis for their decision, it does call for some careful consideration, as it can, under the case law, be taken as an alternative ground for their holding
 Two of the traditional conditions for any immunity, qualified or absolute, have been that the officer was acting within the scope of his authority and that the action undertaken was of a discretionary nature. After reversing the District Court's conclusion that Goodwin's statement was outside the scope of his authority, the majority turns in its note seven to the question of whether the statement was discretionary in nature. With respect to the continued relevance of this question, the majority states:
 Recent Supreme Court decisions have generally avoided the "ministerial-discretionary" language in favor of analysis focusing directly on the need for differing levels of protection in connection with different official functions, the performance of which has given rise to damage claims. See, e. g., Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); and Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).
 With this statement, I understand the majority to mean that the question of whether an action is discretionary in nature is essentially irrelevant to the immunity issue and that it will seek to determine the applicability of Imbler in this case regardless of how the act is characterized. Having suggested that, the majority nonetheless characterizes the action as nondiscretionary:
 However, we note in passing that under a more traditional approach, appellant's act of answering a single inquiry from the court, an inquiry which plainly called for a simple affirmative or negative response, might well have been classified as a ministerial, rather than a discretionary, act, and thus accorded at best a qualified immunity.
 If the majority errs in considering the "ministerial-discretionary" distinction to be outdated, the statement above becomes of critical importance because, as the majority notes, according to this traditional distinction, a nondiscretionary action is entitled to "at best a qualified immunity."
 My disagreement with the majority's argumentation is twofold: first, I believe that under the recent Supreme Court decisions the question of whether an action is discretionary in nature is still a material determination for purposes of immunity, and second, I believe that on the basis of this record the statement of Goodwin did involve the performance of a discretionary act.
 
 
 [1]
 As to the first point, I submit that the language of recent decisions does not indicate an abandonment of the traditional approach. On the contrary, for example, in both Imbler, supra, 424 U.S. at 426, 96 S.Ct. 984, and Wood v. Strickland, 420 U.S. 308, 321, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Court expressly speaks of the need to protect the exercise of officials' discretion in justifying the provision of immunity. And in a recent case not cited by the majority, Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), the Court evidenced by its holding and its analysis that the presence of discretion in the action undertaken is still material to the provision of immunity
 The relevant question in Doe was whether the Public Printer and the Superintendent of Documents were entitled to absolute immunity as federal officials under Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), for their part in printing and distributing a Congressional report containing material which was said to invade the privacy rights of various District of Columbia school children. The Supreme Court looked first at the statutory duties of these officials and found that they had acted within the scope of their authority. See Doe, supra, 412 U.S. at 321-22, 93 S.Ct. 2018. But the Court stated that the inquiry went beyond authorization, and, finding no discretion on the part of the Printer and the Superintendent in deciding whether to print or to distribute the report, Doe, supra at 323, 93 S.Ct. 2018, the Court held unavailable the absolute immunity for federal officials of Barr v. Matteo.
 In short, then, as far as the absolute immunity of Barr was concerned, it was lost, simply enough, because the action undertaken was "ministerial," or involved the exercise of no discretion. Having no independent immunity under Barr, the Printer and the Superintendent were left with whatever immunity would derive under the Speech or Debate Clause from the Congressmen who directed their action. On remand, after further findings, the Printer and the Superintendent were given absolute immunity because the Congressmen, at whose direction they acted, would have had absolute immunity had they themselves made copies of the material and distributed them in like manner. Doe v. McMillan, 185 U.S.App.D.C. 48, 566 F.2d 713 (1977).
 As noted, the majority opinion does not cite or discuss Doe in relation to its proposition. The majority may believe that it would be a "salutary" development to abandon the "discretionary" distinction as a material element, but the Supreme Court cases on the personal immunity of officials do not, I believe, establish an abandonment of the traditional approach.
 
 
 [2]
 Having set out my own view that the "ministerial-discretionary" distinction is still material to the official immunity doctrine, it remains to determine the nature of Goodwin's action here. The majority's view is that his "act of answering a single inquiry from the court, an inquiry which plainly called for a simple affirmative or negative response" ought to be considered a "ministerial" act, involving the exercise of no discretion. I would disagree: Goodwin's decision as to precisely how the question should be answered did entail an element of judgment, thus making his action discretionary for purposes of official immunity
 As outlined in note 32, infra, there may be a basis in the record for a belief by Goodwin that the FBI agent was not represented by counsel, thus taking him out of the judge's question as it was phrased. Fairly taking into account the possibility of that belief, there is clearly injected an element of judgment in the answer. Of course, I am expressing no view of the reasonableness of this possible belief by Goodwin, but I am saying that with the real possibility of this belief which then allowed for a choice among answers that Goodwin's testimony, like the usual testimony, was discretionary in nature. As an exercise of discretion, this action within his authority is thus entitled to absolute immunity, for this prosecutor was acting in his capacity as officer of the court, and, indeed, as a witness.
 
 
 [17]
 Imbler, supra, 424 U.S. at 419 n. 13, 96 S.Ct. at 989
 
 
 [18]
 See, e. g., Wood v. Strickland, supra, 420 U.S. at 322, 95 S.Ct. 992 (school board member acting in the "context of school discipline" qualified immunity); Imbler v. Pachtman, supra, 424 U.S. at 431, 96 S.Ct. 984 (prosecutor as advocate in the judicial process absolute immunity)
 
 
 [19]
 Imbler, supra, 424 U.S. at 417, 96 S.Ct. 984
 
 
 [20]
 Id. at 424, 96 S.Ct. 984
 
 
 [21]
 Id. at 423, 96 S.Ct. at 991
 
 
 [22]
 Id. at 425, 96 S.Ct. at 992
 
 
 [23]
 Id. at 425-26, 96 S.Ct. at 993
 
 
 [24]
 Id. at 425, 96 S.Ct. at 992
 
 
 [25]
 Id. at 426, 96 S.Ct. 984
 
 
 [26]
 Id. at 427, 96 S.Ct. at 993. The Court indicates in a footnote that the possibility of personal liability could also dampen the prosecutor's exercise of his duty to expose "all significant evidence suggestive of innocence or mitigation." Id. at 427 n. 25, 96 S.Ct. at 993
 
 
 [27]
 Id. at 431, 96 S.Ct. at 995
 
 
 [28]
 Id. at 429, 96 S.Ct. at 994
 
 
 [29]
 Ibid
 
 
 [30]
 Id. at 430, 96 S.Ct. at 995
 
 
 [31]
 I regard it as clear beyond peradventure that the grand jury character of the proceeding does not itself exclude applicability of the immunity recognized in Imbler. Those proceedings are a vital and customary part of the prosecutor's job, potentially raising all of the considerations calling for immunity which the Imbler Court considered. See Cawley v. Warren, 216 F.2d 74 (7th Cir. 1954)
 Nor does the subject matter of the testimony, relating as it does to the on-going investigation, render Goodwin's action non-prosecutorial. It is not the content of a given statement, but the context and capacity in which it is made, that determines whether it is within the prosecutorial function. The fact that Goodwin was called to testify in his capacity as head prosecutor leads me to conclude that he was performing within his prosecutorial duties as an officer of the court.
 
 
 [32]
 According to the majority, however, Goodwin's act of testimony did not involve the exercise of discretion. At --- of 186 U.S.App.D.C., n. 6 at 15-16 of 569 F.2d. See n. 16 supra. This characterization is unrealistic. The act of testifying, while compulsory in the sense that one in Goodwin's position cannot freely decline to answer the judge's inquiries, is nonetheless discretionary in that substantial judgment determines the nature of the testimony given. From the perspective of a questioned party, whose knowledge and certainty on the point of interest may be great or small, few inquiries can be said to have but a single honest and correct answer. Discretion and choice determine how best to respond, in view of the precise framing of the question and the state of the witness's knowledge
 Goodwin's answer indicates that it was no exception to the usual discretionary nature of witness testimony. The question from the trial judge was:
 Mr. Goodwin, are any of these witnesses represented by counsel agents or informants of the United States of America?
 The answer of Goodwin, the witness, was:
 No, Your Honor.
 Let us focus, for example, on one phrase in the question "represented by counsel." As the question is framed, it calls for disclosure of the existence of any agent among the witnesses only if that agent is "represented by counsel." If Goodwin believed that the U.S. agent, Emerson Poe, was not represented by counsel, then he obviously had room for judgment about how to answer the question. His answer could have been an unelaborated "no," (as it was), or a "no" with his assumption or qualification attached. Or his answer could even have been itself a question for the judge or counsel about the status of Poe. To see the possibilities of valid answers which did exist, let us look at the record information available to Goodwin.
 On the day before Goodwin was asked his question, counsel for the Vietnam Veterans Against the War/Winter Soldier Organization members orally read in court the names of eighteen potential witnesses who were the subjects of their concern. See Transcript at 15, Appellants' Appendix (App.) at 21. Then the counsel began to identify which potential witnesses were represented by which counsel. Counsel did this by stating the name of the potential witness, followed by the name or names of the counsel representing him. Thus, in the selection below, for example, Mr. Mahoney is represented by Mr. Broege. What follows is the court proceeding as this related to Poe, the U.S. agent. Levine and Peterson are counsel for the VVAW/WSO members; Stafford is the U.S. Attorney at the time. Transcript at 17, App., at 23.
 MR. LEVINE:
 Mr. Mahoney, Mr. Broege.
 Mr. Camile, Miss Judy Peterson, and I have just been informed that Mr. Poe, who I believe originally was not represented by counsel
 MISS DORIS PETERSON:
 Just for the Sixth Amendment motion that Your Honor ruled on the other day.
 MR. LEVINE:
 Now, many of these witnesses I am sorry. Mr. Reif and Doris Peterson.
 MR. STAFFORD:
 Was this Poe?
 MR. LEVINE:
 I would ask other counsel if they have any corrections.
 Especially read in light of the "(c)onsiderable confusion attend(ant upon) the commencement of the grand jury proceeding," At --- of 186 U.S.App.D.C., at 13 of 569 F.2d, it can fairly be said that the selection above also suggests some confusion on this issue as well. Levine and Peterson recite that Poe was not represented at an earlier point. Then, after interruption, Levine lists two names of counsel. And to Stafford's question, apparently whether these counsel represent Poe, there was no answer.
 The reason for setting out this exchange, I must emphasize, is not to assert that Goodwin does have a good-faith defense, for that remains for determination at trial. My purpose rather is to show that with some evident ambiguity about the representation of Poe, Goodwin was required to use an element of judgment and thus discretion in answering the question the next day.
 It is, of course, no rebuttal that defendant is alleged to have given an incorrect answer in denying the presence of an informant. As noted above, the very point of immunity doctrine is to protect officials, and their exercise of discretion, against just such accusations of wrongful conduct which, absent immunity, might state a good cause of action. Nor does the simplicity of Goodwin's negative response to the inquiry ("No") render his testimony ministerial. Any question seeming to call for a yes or no response may always, in the judicial context, be answered in a qualified manner. Goodwin's decision as to precisely how the question should be answered involved a significant exercise of judgment. Whether the judgment thus displayed was good or poor is precisely the issue that the immunity doctrine prevents us from reaching.
 
 
 [33]
 At --- of 186 U.S.App.D.C., at 21 of 569 F.2d (emphasis added)
 
 
 [34]
 My colleagues do admit the logical weakness of their position by confessing, "To some extent, of course, assignment of a particular incident to one of several mutually exclusive abstract categories is likely to involve an element of arbitrariness, especially where the incident in question was clearly not envisioned by those who originally devised the classificatory scheme." At --- of 186 U.S.App.D.C., at 21 of 569 F.2d
 
 
 [35]
 Robichaud v. Ronan, 351 F.2d 533 (9th Cir. 1965)
 
 
 [36]
 Apton v. Wilson, 165 U.S.App.D.C. 22, 506 F.2d 83 (1974)
 
 
 [37]
 Hampton v. City of Chicago, 484 F.2d 602 (7th Cir. 1973)
 
 
 [38]
 See Imbler, supra, 424 U.S. at 430 n. 31, 96 S.Ct. 984, citing, among others, Robichaud, supra and Hampton, supra
 
 
 [39]
 Hampton, supra at 608, quoting Robichaud, supra at 536-37
 
 
 [40]
 At --- of 186 U.S.App.D.C., at 21 of 569 F.2d
 
 
 [41]
 Apton, supra, 165 U.S.App.D.C. at 33, 506 F.2d at 94
 
 
 [42]
 Ibid
 
 
 [43]
 Apton mentioned that the circumstances of courtroom activity by a prosecutor "typically" provided, for example, "the potential sanction of discipline imposed by the court itself." Ibid. (emphasis added). The choice of the word "potential" suggests that it is the opportunity for judicial sanction as an alternative deterrent to civil suits which is critical and not whether that possibility and opportunity are, in fact, used
 
 
 [44]
 Imbler, supra, 424 U.S. at 429, 96 S.Ct. at 994
 
 
 [45]
 Ibid
 
 
 [46]
 See Disciplinary Rule 1-102 Misconduct
 (A) A lawyer shall not:
 (3) Engage in illegal conduct involving moral turpitude.
 (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
 (5) Engage in conduct that is prejudicial to the administration of justice.
 (6) Engage in any other conduct that adversely reflects on his fitness to practice law.
 American Bar Association, Code of Professional Responsibility 3 (1959).
 
 
 [47]
 At --- of 186 U.S.App.D.C., at 24 of 569 F.2d
 
 
 [48]
 Without in any way diminishing my reliance on the doctrine of absolute immunity, in fairness to defendant Goodwin (and as Mr. Justice Holmes did in Alzua v. Johnson, 231 U.S. 106, 34 S.Ct. 27, 58 L.Ed. 142 (1913)), I might say that the record hints that defendant could have a defense on the merits if he were put to trial. It is claimed that in the Florida trial the defense lawyers' proffer of whom they represented at the time of the grand jury proceeding was far from clear, that the FBI informant was not represented for an earlier motion, and that the present defendant (then prosecutor) Goodwin's brief, unelaborated upon reply to the court's question was justified. See also nn. 16 and 32, supra
 On the merits of this we of course can express no opinion.
 
 
 [49]
 At --- of 186 U.S.App.D.C., at 25 of 569 F.2d
 
 
 [50]
 See n. 10 supra
 
 
 [51]
 Imbler, supra, 424 U.S. at 441-45, 96 S.Ct. at 1001 (White, J., concurring in the judgment)
 
 
 [52]
 At --- of 186 U.S.App.D.C., at 24 of 569 F.2d
 
 
 [53]
 Imbler, supra at 443, 96 S.Ct. at 1001 (White, J.)
 
 
 [54]
 Imbler, supra at 431-32 n. 34, 96 S.Ct. 984 (Powell, J., opinion of the Court)
 
 
 [55]
 Id. at 426, 96 S.Ct. at 993
 
 
 [56]
 At --- of 186 U.S.App.D.C., at 21 of 569 F.2d
 
 
 [57]
 Imbler, supra, 424 U.S. at 431 n. 33, 96 S.Ct. at 995
 
 
 [58]
 Supra n. 10
 
 
 [59]
 Imbler, supra at 430 n. 32, 96 S.Ct. at 995
 
 
 [60]
 Poe testified at the jury trial on 20 August 1973. The Jencks Act material, revealing his existence, was made available on 17 August 1973. The same day as the disclosure, 17 August, the trial court held an evidentiary hearing to determine the relationship maintained by Poe with defendants and counsel during and after the July 1972 grand jury proceedings. Based on evidence received at the hearing, and over the objections of the defendants in Briggs that their Fifth Amendment right to Due Process and Sixth Amendment right to counsel had been violated, the trial court permitted Poe to testify. Brief for Appellant at 8 n. 6
 
 
 [61]
 Imbler, supra, 424 U.S. at 430-31, 96 S.Ct. at 995
 
 
 [62]
 Id. at 430, 96 S.Ct. at 995. The policies behind immunity in civil damage suits have not been thought relevant in suits seeking injunctive relief. E. g., Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Dombrowski v. Pfister, 380 U.S. 479, 88 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). While only some of the cases in this line have found injunctive relief against prosecuting officials to be appropriate, the question of the officials' immunity has not been a relevant restraint. With the majority, at --- of 186 U.S.App.D.C., at 15 of 569 F.2d, n. 4, I agree that the question of equitable relief should be left with the District Court for further consideration
 
 
 [63]
 At --- of 186 U.S.App.D.C., at 21 of 569 F.2d (emphasis added)
 
 
 [64]
 At --- of 186 U.S.App.D.C., at 26 of 569 F.2d
 
 
 [65]
 At --- of 186 U.S.App.D.C., at 21 of 569 F.2d
 
 
 [66]
 Brawer v. Horowitz, 535 F.2d 830 (3rd Cir. 1976) (absolute witness immunity available in a Bivens -type suit)
 
 
 [67]
 At --- of 186 U.S.App.D.C., at 17 of 569 F.2d n. 8
 
 
 [68]
 Thus, one witness may have absolute immunity if he testifies about actions or events arising from a capacity that is accorded full protection, like a judge or grand juror, while another witness may not have absolute immunity if he testifies about actions or events arising from a capacity that is given qualified protection, like a police officer. For some witnesses absolute immunity may attach to some of their testimony but only qualified immunity to the rest, with the immunities switching back and forth in the course of the overall testimony
 The witness testimony of a prosecutor may serve as an apt illustration. Consider, for example, the line of cases on "selective" law enforcement. United States v. Steele, 461 F.2d 1148 (9th Cir. 1972), held that the government could not purposely single out a vocal opponent to the census for prosecution for refusal to answer the census. See also Dixon v. District of Columbia, 129 U.S.App.D.C. 341, 394 F.2d 966 (1968). In order to determine if the "purpose" of a prosecution is to retaliate against someone who exercised the right of free speech, it may be necessary to call the prosecutor in the case as a witness for examination by the defendant's counsel, as in United States v. Falk, 479 F.2d 616 (7th Cir. 1973) (en banc) (remand for hearing for defendant to question Assistant U.S. Attorney). If the prosecutor were sued for perjury in connection with his testimony about why he brought a particular prosecution, absolute immunity for the alleged perjury would be available, as Imbler, supra, 424 U.S. at 424, 96 S.Ct. 984, covers the decision when to prosecute. But if, for example, the prosecutor were sued for perjury in connection with the conduct or the rationale for some early general investigation, then only qualified immunity for damages from witness testimony would be available, since the investigative activity of the prosecutor is outside of the Imbler protection in the majority's view. Thus, as a consequence of the majority's rejection of absolute witness immunity, there is left a patchquilt of underlying immunities, varying from witness to witness and subject-matter to subject-matter.
 
 
 [69]
 Witness testimony could arguably cause Fourth Amendment injury, for instance, if evidence seized in fact in an unreasonable search were admitted due to a perjured account by a police officer of the circumstances of the search. Similarly, witness testimony could arguably cause Fifth Amendment injury, e. g., to the privilege against self-incrimination, if a confession taken in fact in violation of the Miranda rules were admitted because of perjured testimony. The instant case illustrates possible Sixth Amendment damage to the right to counsel, i. e., the concealment of an informant among the defendants due to an alleged perjury
 
 
 [70]
 First Amendment injury could arguably arise from witness testimony where an unjustified, albeit truthful disclosure, e. g., of another person's membership in unpopular organizations, enables third parties to retaliate against a person who has exercised his right to freedom of association. See NAACP v. Alabama, 357 U.S. 449, 460-63, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Injury to the right of privacy implicit in the liberty protected by the Fourteenth Amendment could also arguably arise from truthful disclosures by a witness that bring to public light intimate and embarrassing details about other persons without sufficient justification. Cf. Doe v. McMillan, 412 U.S. 306, 308-10, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973). Other unjustified disclosures by a witness, not of private matters, may also be actionable under the Fourteenth Amendment when they result in the deprivation of any "liberty" or "property" recognized by state or federal law. See Paul v. Davis, 424 U.S. 693, 710-11, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)
 
 
 [71]
 At --- of 186 U.S.App.D.C., at 28 of 569 F.2d
 
 
 [72]
 Supra, 424 U.S. at 440, 96 S.Ct. at 1000 (concurring opinion), quoting from Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum.L.Rev. 463, 469 (1909)
 
 
 [73]
 See n. 46 supra
 
 
 [74]
 Imbler, supra at 418, 96 S.Ct. at 989, citing Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). As a statutory cause of action, § 1983 on its face does not create or arguably even allow various immunities in damage suits. "Nevertheless, there are certain absolute immunities so firmly rooted in the common law and supported by such strong policy reasons that the court has been unwilling to infer that Congress meant to abolish them in enacting 42 U.S.C. § 1983." Imbler, supra at 434, 96 S.Ct. at 997. (White, J., concurring opinion). Under § 1983, a study of common law immunities is not only useful as a prudential guide to the policy considerations but as fair evidence of Congressional intent in enacting the broad § 1983. In determining immunities in Bivens -type actions, which are created by the courts, the common law immunities also warrant careful study, even though obviously Congressional intent is not as paramount a factor. For the common law immunities often reflect the relevant policy concerns that the courts themselves would wish to embody in Bivens -type actions. Thus, the place of the common law should be the same in § 1983 analysis and Bivens -type analysis. This view is presumably shared by the majority, as it agrees that the final immunities to be applied should be no different in Bivens -type suits than in § 1983 suits. At --- of 186 U.S.App.D.C., at 18 of 569 F.2d n. 8
 
 
 [75]
 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)
 
 
 [76]
 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)
 
 
 [77]
 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)
 
 
 [78]
 The result of the Court in one case, Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), may be viewed as a departure from the common law, although it did not so state. In holding high executive officials subject to qualified immunity, Scheuer may have been a withdrawal from the absolute immunity at federal common law of Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), and Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1886). But even that federal common law was of relatively recent origin compared to the legislative and judicial immunities with roots in the seventeenth century: "The (absolute) executive privilege in defamation actions would appear to be a judicial creature of less than 65 years' existence." Barr v. Matteo, 360 U.S. 564, 582, 79 S.Ct. 1335, 1345, 3 L.Ed.2d 1434 (1959) (Warren, C. J., dissenting opinion). At --- of 186 U.S.App.D.C., at 28 of 569 F.2d, the majority highlights Scheuer v. Rhodes, supra, as showing how the Supreme Court departs from the immunities of the common law when a constitutional right is involved. In fact, as noted, Scheuer is the only Supreme Court case that does so, (without expressly acknowledging it either), and, moreover, as noted, that common law was of recent origin
 Analogous evidence of the importance of the common law in shaping the law of damage suits under § 1983 and Bivens is that courts will refer to the common law to formulate the various details of a constitutional tort action, see, e. g. Dellums v. Powell, 184 U.S.App.D.C. ---, at ---, 566 F.2d 167, at 175-176 (1977) (issues of pleading and proof in First and Fourth Amendment claims).
 
 
 [79]
 See Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum.L.Rev. 463, 474 (1909)
 
 
 [80]
 King v. Skinner, Lofft 55, 98 Eng.Rep. 529, 530 (K.B.1772)
 
 
 [81]
 Sacks v. Stecker, 60 F.2d 73, 75 (2d Cir. 1932) (Hand, A., J.)
 As to just how "universal" the acceptance is, observe the age (from 1851 to 1907), the scarcity and source (five state and no federal) of the authorities cited in the majority opinion. Moreover, the one common law case that the majority cites to cast doubt upon absolute witness immunity, Liles v. Gaster, 42 Ohio St. 631 (1885), merely reserves the question. The only qualification on the absolute rule cited, pertinency or relevancy, is one which appears necessarily inherent in the rule from the outset.
 
 
 [82]
 See, e. g., Brawer v. Horowitz, 535 F.2d 830 (3rd Cir. 1976). Brawer began its analysis of witness immunity in a Bivens -type suit with an inquiry into the immunity at common law. This inquiry, as the majority contends, at --- of --- U.S.App.D.C., at 16-17 of 569 F.2d n. 7, seeks to ascertain the immunity at federal common law. Brawer found a firm and established absolute witness immunity, citing, among other authorities, Judge Hand's conclusion, supra n. 81, that relevant "words spoken" and "affidavits filed" were entitled to absolute immunity in the federal courts
 
 
 [83]
 At --- of 186 U.S.App.D.C, at 16-17 of 569 F.2d n. 7. As a starting point of analysis for § 1983 immunities, the Supreme Court does not look exclusively, however, to the federal common law. For example, Wood v. Strickland, supra, 420 U.S. at 318, 95 S.Ct. 992, expressly relied on state cases in determining the particular common law immunity. Looking at the § 1983 cases as a whole, it appears that the Court takes into account both state and federal common law in ascertaining the common law "tradition," which it then decides whether to carry over to § 1983
 
 
 [84]
 Restatement of Torts (Tent. Draft No. 20) § 588
 
 
 [85]
 See F. Harper & F. James, The Law of Torts, § 5.22 at 424 (1956); W. Prosser, The Law of Torts, § 114 at 778 (4th ed. 1971)
 
 
 [86]
 Imbler, supra, 424 U.S. at 439, 96 S.Ct. at 999
 
 
 [87]
 The common law immunity was not confined to defamation suits but extended, as noted, to any suit for damages arising out of relevant testimony. Of relevance to the present case is the rule that "false testimony in a criminal action that results in a conviction of the plaintiff does not furnish the basis of a civil suit to recover damages." 60 Am.Jur.2d, Perjury, § 75 (footnotes omitted)
 
 
 [88]
 Petty v. General Accident Fire & Life Assurance Corp., 365 F.2d 419, 421 (3rd Cir. 1966)
 
 
 [89]
 Imbler, supra, 424 U.S. at 439, 96 S.Ct. at 999
 
 
 [90]
 W. Prosser, supra n. 85 at 778
 
 
 [91]
 F. Harper & F. James, supra n. 85 at 424
 
 
 [92]
 Imbler, supra, 424 U.S. at 440, 96 S.Ct. at 999 (White, J.)
 
 
 [93]
 Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950)
 
 
 [94]
 Ibid
 
 
 [95]
 Ibid
 
 
 [96]
 Imbler, supra, 424 U.S. at 423 n. 20, 96 S.Ct. 984; Id. at 438, 96 S.Ct. 984 (White, J.)
 
 
 [97]
 Imbler, supra at 426, 96 S.Ct. 984; Id. at 439, 96 S.Ct. 984 (White, J.)
 
 
 [98]
 In terms of policy analysis of witness immunity, the majority appears to rest its entire argumentation on the following enigmatic sentence: "Policy considerations counselling the insulation of private citizens from civil liability arising from their performance as witnesses do not apply with equal force when a complaint charges that constitutional rights have been violated by a public employee operating from the witness stand." At --- of 186 U.S.App.D.C., at 28 of 569 F.2d (emphasis original). The exact meaning to be drawn from this single statement remains unclear to me. There are two possible meanings that can be inferred; both, however, are without merit, certainly in this conclusory form
 The first possible meaning is that because appellees allege a "constitutional" tort rather than a common law tort the significance of an absolute witness immunity at common law should be greatly discounted. I agree with the majority, as I have already stated, supra at --- - --- of 186 U.S.App.D.C., at 50 of 569 F.2d, that the common law is not binding for a Bivens -type action, but I hasten to repeat, see supra at --- of 186 U.S.App.D.C., at 50 of 569 F.2d, that in virtually all cases, with the possible exception of one, see n.78 supra, the Supreme Court has adopted the immunity of the common law. Particularly with functions related to the judicial process, Pierson (judges) and Imbler (prosecutors), the Court has followed the common law immunity even in the setting of a "constitutional tort." The majority may wish to argue in particular policy terms why absolute witness immunity is not justified in a Bivens -type suit, but it fails to do that here. Instead, the majority ignores Tenney, Pierson and Imbler, where the absolute immunities of the common law were all sustained in § 1983 actions, if it means to rest its case for the rejection of absolute common law immunity solely on the fact that a "constitutional tort" is alleged here.
 The second possible meaning of the majority's key sentence, quoted above, is that because the witness testifying is a government official rather than a private citizen the policy concerns of the common law, e. g. about the possible inhibition of full disclosure from the threat of civil suit, are not as realistically justified. The majority provides no support or argumentation at all for this contention, if, indeed, this is what the majority is advancing. I would think, as a practical matter, that the policy concerns about the private citizen have at least as much bearing to the public official. Let me take simply one illustration. Behind the concern for "intimidation" of the witness by threat of lawsuit is the undoubted realization of the common law of how burdensome litigation can be for the private party. Litigation for the public official is not necessarily any less burdensome: even if government counsel is provided, the long time delay of litigation, with possible money liability at the end, may be quite unsettling. In Imbler, for instance, the issue of absolute immunity was not finally determined until 1976, while the events of the robbery and the trial occurred in 1961; in Imbler, the criminal defendant appealed through the state courts, sought habeas through the state courts, sought habeas in the federal courts and then sued the prosecutor.
 If a § 1983 suit arising out of a criminal conviction has to await the full exhaustion of remedies on appeal and at habeas, see Guerro v. Mulhearn, 498 F.2d 1249, 1253 (1st Cir. 1974), then the pattern of delay in Imbler might not be atypical. Delay, of course, makes litigation additionally burdensome, particularly for officials who may have left government or taken up other positions, e. g., judgeships, as did one of the defendants in this very suit. (William H. Stafford of the Northern District of Florida; see Briggs v. Stafford, 186 U.S.App.D.C. ---, 569 F.2d 10 No. 75-1578, a companion case).
 This brief line of argument about the burdensomeness of litigation for officials serves to illustrate that there are a number of issues, calling for exposition and debate, about whether the policy concerns of the common law towards a witness apply with "equal force" to government officials as they do to private parties. If the majority means to rest its rejection of the common law immunity on this difference, it is surely obliged to offer more reasons and support than its summary statement here.
 
 
 [99]
 Imbler, supra 424 U.S. at 426, 96 S.Ct. at 993
 
 
 [100]
 Ibid
 
 
 [101]
 See Imbler, supra 424 U.S. at 428-29, 96 S.Ct. 984
 
 
 [102]
 535 F.2d 830 (3rd Cir. 1976)
 
 
 [103]
 Id. at 837
 
 
 [104]
 At --- - --- of 186 U.S.App.D.C., at ---- - 28 of 569 F.2d n.15
 
 
 [105]
 Id. at --- of 186 U.S.App.D.C., at 28 of 569 F.2d. Indeed, our own circuit en banc proceeded to the merits of an equal protection challenge by "reserving," and assuming arguendo, the question of state action. Ripon Society v. National Republican Party, 173 U.S.App.D.C. 350, 525 F.2d 567 (1975) (McGowan, J., for the court)
 
 
 [106]
 Imbler, supra at 427 n. 25, 96 S.Ct. at 993
 
 
 [107]
 At ---, --- - --- of 186 U.S.App.D.C., at ----, 26-27 of 569 F.2d
 
 
 [108]
 At ---- of 186 U.S.App.D.C., at 25 of 569 F.2d
 
 
 [109]
 Nor did the common law offer less protection to the witness who was not cross-examined. In fact, the only requirement of the common law for full protection is that the "witness . . . must be engaged in giving testimony that has some reasonable relationship at the case in hand." F. Harper & F. James, supra n. 85 at 424
 
 
 [110]
 See n. 10 supra and text, supra at --- - --- of 186 U.S.App.D.C., at 23-24 of 569 F.2d
 
 
 [111]
 It thus makes no difference that the judge here asked only a single question, calling for a simple answer. The common law did not make an exception even for a witness who appears to have plainly given a false answer. See supra at --- of --- U.S.App.D.C., at 52 of 569 F.2d. However, I do not understand the majority to be basing its rejection of absolute witness immunity here upon a "plain perjury" exception that it may wish to engraft onto the witness immunity doctrine
 
 
 [112]
 At --- of 186 U.S.App.D.C., at 26 of 569 F.2d
 
 
 [113]
 To begin with, the majority's view of Goodwin's and the grand jury's roles and relationships rests on some very fundamental misconceptions, as I hope I have made clear in Part I, C, supra. But even to take the majority's distorted separation of grand jury functions and the prosecutor's supposedly different immunity hinging thereupon, the facts do not bear out the majority's claims. The majority says that at the time of the alleged perjury the grand jury was functioning as an "investigative tool" for use as discovery into VVAW activities and not as a "deliberative body" deciding whether to return indictments. At --- of 186 U.S.App.D.C., at 24 of 569 F.2d. As suggested earlier, supra n. 11, how then does the majority explain the uncontested fact that on the same day as Goodwin's testimony, 13 July 1972, the grand jury returned indictments against six of the appellees for criminal violations of eight sections of the U.S.Code?
 Astonishingly, the majority cites as evidence of the "investigative" function of the grand jury on 13 July the fact that "none of the VVAW members subpoenaed actually testified." At --- of 186 U.S.App.D.C., at 24 of 569 F.2d (emphasis original). I would think that this fact points in precisely the opposite direction, that because not a single subpoenaed VVAW member was called for inquiry before the grand jury, the grand jury was not acting primarily as an "investigative tool" into the VVAW. The more logical conclusion to draw from this fact and from the fact that the indictments were returned on the day of the alleged perjury is that the grand jury was, indeed, functioning in its role as a deliberative body deciding whether to return indictments. If there is any validity whatsoever in the principle of separating grand jury functions espoused by the majority, the facts here dictate a conclusion different from that reached by the majority.
 
 
 [114]
 At --- of 186 U.S.App.D.C., at 26 of 569 F.2d
 
 
 [115]
 See W. Prosser, supra n. 85 at 778
 
 
 [116]
 See F. Harper & F. James, supra n. 85 at 423-24, and cases there cited
 
 
 [117]
 See supra at --- - --- U.S.App.D.C., at 51-53 of 569 F.2d
 
 
 [118]
 The sole question for decision in this case is whether Goodwin is entitled to absolute or qualified immunity. Having decided that only qualified immunity is appropriate here, the majority seeks in addition to define the exact scope of that immunity on remand: "(H)is protection from liability depends upon a showing that he entertained a good-faith, reasonable belief in the truth of his response to the federal district judge in Florida." At --- of 186 U.S.App.D.C., at 16 of 569 F.2d. Believing that the definition of good-faith immunity may be more complicated than the majority appears to recognize, I think that the formulation of this definition should be left for the trial judge in the first instance. This is so particularly since the exact definition of the immunity is unnecessary and irrelevant to the question for decision
 The problem that I have with the majority's definition is that it does not focus on whether Goodwin may have had a reasonable, good faith belief that his action did not violate the constitutional rights of appellees. The leading cases on the immunity standard traditionally inquire into the reasonableness and the good-faith belief that one's action did not violate the Constitution. See, e. g., Wood v. Strickland, 420 U.S. 308, 321-22, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); Zweibon v. Mitchell, 170 U.S.App.D.C. 1, 8, 516 F.2d 594, 671 (1975) (en banc). Instead, the majority ignores the Constitutional dimension to the qualified immunity and inquires only as to the good-faith belief in the accuracy of the testimony. The majority is thus assuming that perjury by a prosecutor is per se a constitutional violation, an assumption too complicated to be made sub silentio at this stage. Perjury may amount to a constitutional violation, depending upon its effect, cf., Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (due process), but similarly may not violate a defendant's constitutional rights, cf., Weatherford v. Bursey, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) (right to counsel), depending upon all the circumstances. As I shall show, the possibility of these different results means that the definition of a qualified immunity in this case must take into account some belief as to whether the Constitution was violated. In other words, it may be that an alternative ground for qualified immunity might be that Goodwin possessed a good faith reasonable belief that his perjury would do no constitutional harm to appellees. It may develop at trial that there is no basis for this ground, but the majority should not foreclose it at this stage.
 My reservations about the summary definition of the majority may be more specifically illustrated by reference to the recent case of Weatherford v. Bursey, supra. In that case, the prosecution concealed the presence of an undercover agent among defendants up until the day of trial. Even though the agent attended pre-trial meetings between the other defendants and their counsel, the Court found, in a § 1983 action for damages, that there had been no violation of the Sixth Amendment right to counsel, noting, for example, that the agent had not communicated the substance of the overheard conversations to the prosecution or at trial. The purpose of the concealment instead, the Court also noted, may have been so that the State could effectively use his services on other matters.
 In the Weatherford situation, where the presence of the undercover agents among the defendants did not violate the Sixth Amendment, it follows that the prosecutor does not violate the Sixth Amendment by concealing that presence. It might also follow that if the concealment were accomplished by perjury, the perjury, however reprehensible it may be, might not cause any injury to the Sixth Amendment rights of the defendants because the effect of the perjury was only to continue the concealment of the agent, whose presence did not violate the Sixth Amendment.
 If, on the other hand, the agent was reporting on the defense deliberations to the prosecution, Weatherford suggests that there may be an infringement of the Sixth Amendment's right to counsel. And, therefore, if perjury concealed the presence of such an informer, that action could well cause injury to Sixth Amendment rights. This is the situation alleged here, that the informer was supposed to have disclosed the confidences of defense deliberations to the prosecution and that the alleged perjury of the prosecutor allowed this to happen by concealing the identity of the informer. Even should all this be proved at trial, I am not certain that Goodwin could secure immunity only if he could show a reasonable, good-faith belief in the accuracy of his testimony. It may be that there would also be qualified immunity if Goodwin could show a reasonable, good-faith basis for his belief that his testimony, even if he was unsure as to its accuracy, would not cause injury to the Sixth Amendment rights of the defendants. In other words, if Goodwin reasonably believed, for example, that the informant, whose identity he was concealing, was not supposed to disclose the defense confidences to the prosecution and if Goodwin had a good-faith belief that the concealment was designed only so that the informant's services could be effectively used on other matters, perhaps unrelated to this prosecution, then he might have had a reasonable and good-faith belief that he was not violating the Sixth Amendment with his inaccurate testimony.
 The analysis suggested above for the Sixth Amendment may also be appropriate for the other constitutional injuries. Allegations of injury to Fifth Amendment due process, for example, may turn upon the prosecutor's duty under Brady v. Maryland, supra, to disclose certain classes of materials to the accused upon request; there may also be room here for a defense of reasonable and good-faith belief that the due process rights of appellees, as defined by Brady, were not infringed by Goodwin. The short of it is that, unless perjury by a prosecutor is to be taken as a per se violation of the Constitution, the definition of a qualified immunity, when perjury is alleged, must take into account the nature of the particular constitutional injuries claimed, e. g., right to counsel or due process. Since this task may benefit from an understanding of the facts that develop at trial and from a careful study of the relevant case law, the formulation of the definition should be left with the trial judge in the first instance. As an illustration of a qualified immunity that properly takes into account the legal standard which has allegedly been violated, see the jury instructions found at Dellums v. Powell, 184 U.S.App.D.C. ---, at --- n. 50, 566 F.2d 167, at 186 (1977).
 
 
 [119]
 At --- - --- of 186 U.S.App.D.C., at 25 of 569 F.2d
 
 
 [120]
 See at --- of 186 U.S.App.D.C., at 26 of 569 F.2d n. 14
 
 
 [121]
 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977)
 
 
 [122]
 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)
 
 
 [123]
 Abney, supra at 662, 97 S.Ct. at 2042
 
 
 [124]
 Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950). While the majority suggests that under the facts in Gregoire the result might come out differently today, it expressly refrains from "criticizing any of the reasoning employed by Judge Hand." At --- of 186 U.S.App.D.C., at 22 of 569 F.2d n. 10
 
 
 [125]
 Justice Powell in Imbler also points to the significance of its protection: "An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." 424 U.S. at 419 n. 13, 96 S.Ct. at 989 (emphasis added)
 
 
 [126]
 At --- of 186 U.S.App.D.C., at 26 of 569 F.2d n. 14
 
 
 [127]
 See, e. g., D'Ippolito v. Cities Serv. Co., 374 F.2d 643, 649 (2d Cir. 1967). But see Firestone Tire & Rubber Co. v. General Tire & Rubber Co., 431 F.2d 1199 (6th Cir. 1970), cert. denied, 401 U.S. 975, 91 S.Ct. 1196, 28 L.Ed.2d 325 (1971) (refusal to certify reviewable for clear abuse of discretion). The legislative history indicates that certification was to be a mandatory condition for appeal under section 1292(b). Hearings on H.R. 6238 and H.R. 7260 Before Subcomm. No. 3 of the House Comm. on the Judiciary, 85th Cong., 2d Sess. ser. 11 (1958). See generally Note, Interlocutory Appeals in the Federal Courts under 28 U.S.C. § 1292(b), 88 Harv.L.Rev. 607, 613-617 (1975)
 
 
 [128]
 9 Moore's Federal Practice P 110.22(5) at 267 (2d ed. 1975)
 
 
 [129]
 La Buy v. Howes Leather Co., 352 U.S. 249, 259-61, 77 S.Ct. 309, 315, 11 L.Ed.2d 290 (1957). See also Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964); Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967)
 
 
 [130]
 Note, Supervisory and Advisory Mandamus under the All Writs Act, 86 Harv.L.Rev. 595, 618 n. 96 (1973) (emphasis added)